IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

          **v.**                    **Criminal No.** 20-258 (FAB)

RAFAEL PINA-NIEVES,

    **Defendant.**

OPINION AND ORDER

BESOSA, District Judge.

Defendant Rafael Pina-Nieves ("Pina") moves to suppress evidence pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. sections 2510 *et seq.* ("Title III"). (Docket No. 52.)  The motion also requests an evidentiary hearing.  Id.  For the reasons set forth below, Pina's motion is **DENIED.**

I.  **Background[1]**

Pina is a reggaeton music producer and owner of Rogelio's gas station in Caguas, Puerto Rico.  (Docket No. 52, Ex. 2 at p. 8.)  This business is managed by Joed Romero-Soler ("Romero"), Pina's "close confidant" and personal accountant.  Id. at p. 11.  A

---

[1] Federal Bureau of Investigation ("FBI") special agent Justin Turner ("Turner") submitted an affidavit in support of the Title III application.  (Docket No. 52, Ex. 2.)  The following allegations are based exclusively on Turner's redacted affidavit.  Id.

confidential human source ("CHS") informed the FBI that Pina, Romero, and two unnamed individuals "[launder] money through gas stations." Id. The unnamed individuals transport and distribute illicit narcotics in Puerto Rico. Id.

After gathering additional evidence, the United States applied for an order authorizing the interception of wire communications pursuant to 18 U.S.C. section 2518. See In re Interception of Wire Communications, 20-mc-053 (FAB). United States District Court Judge Raúl Arias-Marxuach issued the interception order on February 4, 2020. (Docket No. 52, Ex. 1.) This order authorized the United States to record surreptitiously conversations and voice-mail messages to and from Romero's cellular phone. (Docket No. 52, Ex. 1.)

On February 6, 2020, the FBI intercepted a conversation between Pina and Romero (hereinafter, "Call 121"). The following is an excerpt from this interception:

Pina: And what do we do with the safe, motherfucker?

Romero: Bro, right. You have that there built-in. A whole ordeal, right? No, man, leave it open.

Pina: Man, yes.

Romero: You know, and take out whatever you have . . . and, if you have anything . . . and leave it open behind there so that [unintelligible] there and uses it. You know, tell Miguel to reset it. You know, that, look . . .

    Pina: Nah, nah, bro, I have money and I have all sorts
        of things in there: my guns, rifles, bullets.

    Romero: Well, exactly, have Miguel take out anything he
        needs to take out.  You know what you have in
        there, right?

    Pina: Yes, but no, no . . . I'm not giving that
        motherfucker anything.

    Romero: Well, I don't know . . . and . . . and . . . you
        know, the guns?  Give them to Jonny.

    Pina: No because all of that is *cuenta loca* [literally:
        crazy account].

See Docket No. 98 at p. 4; Docket No. 114, Ex. 2 at pp. 11-13.

Subsequently, law enforcement officers executed a search warrant at Pina's residence on April 1, 2020, seizing one 9mm Glock pistol, one .40 caliber Smith & Wesson pistol, and 526 rounds of ammunition. Id. at p. 4. On August 13, 2020, a grand jury returned an indictment charging Pina with possession of a firearm by a convicted felon (count one), and possession of a machinegun, in violation of 18 U.S.C. sections 922(g)(1) and 922(o) (count two), respectively. (Docket No. 1.)[2]

Pina moves to suppress evidence obtained from the interception of Call 121, contending that the Title III order is invalid. (Docket No. 52.)  The affidavit allegedly "confused"

---

[2] Pina pled guilty to one count of bank fraud on May 13, 2015. (Case No. 12-215, Docket No. 416.)  The Court sentenced Pina to the time he had already served, and two years of supervised release. Id., Docket No. 496.

Judge Arias.  (Docket No. 53 at p. 3.)  It is Pina, however, who is confused.  He misstates the law and sets forth an incomplete rendition of the underlying federal investigation.

## II.  Title III of the Omnibus Crime Control and Safe Streets Act

Law enforcement officers routinely conducted clandestine wiretaps in the early twentieth century, eavesdropping on private citizens without judicial oversight.  See Wesley M. Oliver, America's First Wiretapping Controversy in Context and as Context, 34 HAMLINE L. REV. 205, 206 (2011) (noting that police recorded conversations "as early as 1896, but went undiscovered until 1916 when there were revelations that the Mayor of New York City had ordered the tapping of [telephones belonging to] Catholic priests").  Intrusive wiretaps prompted the enactment of legal protections to "guard against the realization of Orwellian fears." United States v. Marion, 535 F.2d 697 (2d Cir. 1976).  Ultimately, Congress passed Title III in 1968 to preserve privacy rights "while, at the same time, authorizing the use of electronic surveillance evidence obtained by law enforcement under specified conditions."  Bartnicki v. Vopper, 532 U.S. 514, 523 (2001).

Title III interceptions are reserved for certain, enumerated offenses (i.e. money laundering and drug trafficking).  18 U.S.C. § 2516(1).  Wiretapping is an extraordinary investigative tool, designed to be "the exception and not the rule."  United States v.

Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987).  A two-tiered review process diminishes the threat of unlawful wiretaps.  First, the Attorney General or a designated Department of Justice representative reviews and, if appropriate, approves the Title III application.  United States v. London, 66 F.3d 1227, 1233 (1st Cir. 1995) ("Title III compels local prosecutors to obtain internal authorization from a statutorily designated Justice Department official prior to applying for a judicial interception order.").

Second, the United States Attorney's Office submits the interception application to a "Federal judge of competent jurisdiction." 18 U.S.C. § 2516(1).  The Federal judge then issues an interception order after confirming that the application complies with Title III, accepting "the facts as stated in the affidavit." United States v. Ashley, 876 F.2d 1069, 1073-74 (1st Cir. 1989).  For this order to issue, the United States must establish that:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense; . . .
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

    (d) there is probable cause for belief that the facilities form which, or place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or leased to, listed in the name or, or commonly used by such person.

18 U.S.C. § 2518(3). The third subsection is referred to as the necessity requirement, a "relative term [that] is context-specific." United States v. Santana-Dones, 920 F.3d 70, 76 (1st Cir. 2019) (citation omitted). The remaining subsections constitute the "probable cause" requirement. Title III also mandates that wiretaps "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception" (hereinafter, "minimization requirement"). 18 U.S.C. § 2518(5).

    "Aggrieved persons" may move to suppress intercepted communications by establishing, *inter alia*, that "the order of authorization or approval under which it was intercepted is insufficient on its face." 18 U.S.C. § 2518(10)(a).[3] Pina shoulders the burden of establishing that the interception order contravenes Title III. See United States v. Verdin-García, 516 F.3d 884, 890 (10th Cir. 2008) ("Once a wiretap has been authorized

---

[3] As a "party to [an] intercepted wire, oral, or electronic communication," Pina qualifies as an "aggrieved person." 18 U.S.C. § 2510; See, e.g., United States v. Lyons, Case No. 10-10159, 2011 U.S. Dist. LEXIS 93042 at *4-5 (D. Mass. Aug. 18, 2011) ("Lyons only has standing to challenge interceptions directed against him or to which he was a party.").

by a judge, it is presumed proper, and the burden is on the defendant to prove its invalidity."). The standard of review is deferential: This Court's "role is not to make a *de novo* determination of sufficiency as if it were [the issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." Ashley, 876 F.2d at 1074 (quotation omitted); see United States v. Corrado, 227 F.3d 528, 539 (6th Cir. 2000) ("[The] fact that a later judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant.") (citation and quotation omitted).

**III. Discussion**

Pina presents three arguments in support of his motion to suppress. (Docket No. 52.) First, the affidavit allegedly failed to satisfy the probable cause requirement. Id. at p. 1. Second, the affidavit "contained an insufficient statement of necessity." Id. at p. 10. Third, FBI agents purportedly intercepted "impertinent calls in violation of the Order." Id. at p. 24. These arguments are unavailing.

**A. Probable Cause**

The motion to suppress provides that the "government lacked even the slightest sense of reasonable suspicion that **Pina** was

committing a federal offense." <u>Id.</u> at p. 4 (emphasis added).[4]
This interpretation of Title III is overly restrictive. The United
States need only demonstrate probable cause that **"an individual"**
committed an enumerated offense. <u>See</u> 18 U.S.C. § 2518(3). The
mere mention of an individual in a Title III affidavit does not
require a discrete showing of probable cause as to that person.
<u>See</u> <u>United States v. Silva-Rentas</u>, Case No. 14-754, 2017 U.S. Dist.
LEXIS 10009 at *17 (D.P.R. Jan. 23, 2017) ("[T]he government need
not establish probable cause as to all participants in an
intercepted conversation.") (Domínguez, J.) (citing <u>United States
v. Bannerman</u>, Case No. 03-10370, 2005 U.S. Dist. LEXIS at *10-11
(D. Mass. Aug. 25, 2005) (rejecting the "contention that the
government must establish probable cause for each person named in
a wiretap application"); <u>United States v. Magee</u>, Case No. 13-176,
2014 U.S. Dist. LEXIS 126246 at *9 (D. Me. Sept. 8, 2014) (denying
motion to suppress because "[Magee] articulates no challenge to
the finding that the affidavits established probable cause to

---

[4] <u>See</u> Docket No. 52, at p. 2 (the United States did not "make even a feeble
attempt to individualize the probable cause it allegedly had with respect to
the four subjects"); at p. 13 (the United States "made an insufficient showing
of probable cause with respect to [Pina] and the interception of call 121 was
therefore illegal"); at p. 17 (the information in the affidavit "does nothing
to increase the probable cause against [Pina]"); at p. 17 ("There is no probable
cause to intercept [Pina]").

believe that the Jones telephones were being used in an illegal operation").[5]

To require probable cause for every individual named in the application is not only contrary to precedent, it also places the United States in an untenable position.  Title III mandates that the United States name all individuals "whose conversations it expects will be intercepted over the target telephone."  <u>United States v. Donovan</u>, 429 U.S. 413, 428 (1977).  Persons named in the

---

[5] The Court is not aware of, and the parties do not cite, authoritative precedent regarding this issue.  In <u>United States v. Santana</u>, the United States District Court for the District of New Hampshire held that a Title III "affidavit sufficiently presented facts showing probable cause to believe that [the defendant] was committing, had committed, or was about the commit the listed drug related crimes." <u>United States v. Santana</u>, 218 F. Supp. 2d 53, 57 (D.N.H. 2002).  On appeal, the defendant conceded that the "government had probable cause to suspect [that] a [third-party] was committing or would commit a crime," but that "it lacked probable cause to identify [the defendant] as involved in criminal activity." <u>United States v. Santana</u>, 342 F.3d 60, 64-65 (1st Cir. 2003).  Rather than refute the premise of this argument (<i>i.e.</i> that probable cause must extend to every person named in the affidavit, the <u>Santana</u> court affirmed the district court <i>in toto</i>: The affidavit contained a "sufficient basis for the issuing judge to determine that [the defendant]" was committing an offense.  <u>Id.</u> at 65.  Accordingly, <u>Santana</u> is not dispositive. Sister courts of appeals have, however, rejected Pina's construction of the probable cause requirement.  <u>See</u> <u>United States v. Figueroa</u>, 757 F.2d 466, 475 (2d Cir. 1985) (holding that "the government need not establish probable cause as to all participants in a conversation.  If probable cause has been shown as to one such participant, the statement of other participants may be intercepted if pertinent to the investigation"); <u>United States v. Dunn</u>, 723 F.3d 919, 927 (8th Cir. 2013) (holding that Title III "does not prohibit the government from listing someone as a target subject even if probable cause is lacking as to that person") (citing <u>United States v. Martin</u>, 599 F.2d 880, 884-85 (9th Cir. 1979)); <u>United States v. Domme</u>, 753 F.2d 950, 954 n.2 (11th Cir. 1985) ("A wiretap application need not provide probable cause of criminal activity for each person named in an application . . . What is required is sufficient information so that a judge could find probable cause to believe that the telephone in question is being used in illegal operation").

order or application are entitled to an inventory notice. 18
U.S.C. § 2518(8)(d). This document is issued after the
interception, disclosing the "entry of the order or application,
its disposition, and communications intercepted." United States
v. Rodrígues, 850 F.3d 1, 7 (1st Cir. 2017). Bad faith omissions
by the United States and attempts to circumvent the inventory
notice may subject the interceptions to suppression, a remedy to
ensure that the Title III application is inclusive. Id. Pina's
understanding of the statute incentivizes minimal compliance with
the probable cause requirement: Restricting the number of persons
named in the application reduces the probable cause burden. This
posture is inconsistent with the inventory notice obligation,
however, by penalizing the United States for submitting
comprehensive applications. See United States v. Rodríguez, 606
F. Supp. 1363, 1370 (D. Mass. 1985) ("To require identification of
persons for whom probable cause exists, yet punish for naming a
person for whom it does not exist would be to force passage between
Scylla and Charybdis").

## 1. Probable Cause to Wiretap Romero's Cellular Phone

The Fourth Amendment and Title III probable cause
standards are coextensive. United States v. Santana, 218 F. Supp.
53, 56 (D.N.H. 2002); see United States v. Goldstein, 989 F.3d
1178, 1198 (11th Cir. 2021) (holding that "a wiretap must be

supported by the same probable cause necessary to obtain a search warrant"). Essentially, probable cause exists if "the facts and circumstances as to which the police have reasonable trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." Robinson v. Cook, 706 F.3d 25, 32 (1st Cir. 2013) (citation omitted); see Illinois v. Gates, 462 U.S. 213, 242 (1983) (holding that probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place"); Hoffman, 832 F.2d at 1305-06 ("'Probable cause' need not be tantamount to 'proof beyond a reasonable doubt.'").

Turner's affidavit contains ample evidence to sustain the Title III order. On a date not disclosed, the FBI conducted an initial interview with the CHS "based on [their] close involvement with suspected members and facilitators of Drug Trafficking Organizations (DTOs) in Puerto Rico." Id. at p. 13. According to the CHS, a DTO member requested that they "move approximately three (3) million U.S. currency from Puerto Rico to the U.S. Virgin Islands." Id. As a "test-run," the DTO member tasked the CHS with transporting money that "would already be clean[ed]" by Romero, the "money manager" for Pina. Id. at p. 14. On another occasion, Romero "agreed to launder [REDACTD AMOUNT] of illicit proceeds for a client of the CHS during an in-person

meeting." Id. Romero referred to "his ability to launder money through the gas stations." Id.

Turner's affidavit alleges that "consensually monitored telephone calls . . . indicated that [Romero] and [Pina] launder money for Puerto Rican DTOs and would have large amounts of cash on hand due to upcoming concerts." Id. at pp. 19-20. According to Turner, "DTO money could be co-mingled into legitimate concert proceeds in order to conceal its origin." Id. at p. 20; see United States v. Arvizu, 534 U.S. 266, 277 (2002) (noting that courts may "[give] due weight to the factual inferences drawn by" law enforcement officers in assessing the existence of probable cause). The redacted affidavit does not disclose the dates of recorded conversations. (Docket No. 52, Ex. 2.) These conversations are set forth in numerical order:

| Recorded Conversation | Summary |
|---|---|
| No.1 | The CHS offered his "services" to Romero. (Docket No. 52, Ex 2 at p. 13.) "[Romero] expressed interest in utilizing the CHS' services." Id. |
| No. 2 | A person referred to "[Romero] as an individual who has laundered money." Id. at p. 20. |
| No. 3 | The CHS and an unidentified person "discuss[d] an incoming shipment of cocaine," the "anticipated price per kilogram," and "[Romero's] ability to launder money." Id. Romero is responsible for "handling the finances of [Pina]" and is referred |

| | |
|---|---|
| | to as "El Mejor Lavando," or "the Best" at laundering money." Id.    The unidentified individual "implies that [Romero] is laundering money, among other things, for [Pina]." Id. |
| **No. 4** | The CHS overheard unidentified individuals discuss an incoming drug shipment on a "burner phone," "commonly utilized by DTO associates to avoid detection." Id. at p. 21. A participant to this conversation disclosed that:<br><br>They were in open seas and unable to bring the load [of cocaine] to shore due to hazardous conditions. [They] would continue trying until morning and if unsuccessful, would return to the island.<br><br>Id. After the CHS alerted the FBI, special agents notified the United States Coast Guard ("USCG"). Id. "The CHS continued to provide updates over the next several days as to the whereabouts of the vessel." Id. Subsequently, the USCG located the vessel and seized the cocaine. Id. Following this intervention, the CHS recorded conversations "where [an unidentified individual] discussed the seizure of the vessel." Id. |
| **No. 5** | An unidentified individual received a medium-sized box with United States Postal Service markings, containing an undisclosed amount of money. Id. The recording depicts an unidentified individual "count[ing] the money because the sender had shorted money to DTOs in the past." Id. |
| **Nos. 6 & 7** | During two consecutive conversations, an unidentified individual stated that Romero "was interested in working with the CHS and would like to have an in-person meeting." Id. at p. 22. Romero echoed this sentiment in the second conversation. Id. |
| **No. 8** | The CHS and an unidentified individual discussed a drive-by shooting at Pina's gas station, the latter sating that: |

Criminal No. 20-258 (FAB)                                              14

|        |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                  |
| ------ | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
|        | Pina refused to cooperate with local law enforcement regarding the shooting and lied . . . about the security cameras at the office, which [Pina] advised were inoperable.  The cameras, however, were not inoperable and did in fact capture the shooting.  The shooting was retaliation for [Pina] bringing a reggaeton artist back to Puerto Rico who was previously banned.  Id. at pp. 23-24. |
| **No. 9** | An unidentified individual and the CHS "discuss[ed] the laundering of money." Id. at p. 24.  The former "identifies [Romero] as his friend," and that "[Romero] and [Pina] are also close friends." Id. The CHS asked this person "about the ability of [Romero] to launder $1 million dollars for him/her." Id.  The unidentified individual stated that "this should not be a problem for 'them,' referring to [Romero] and [Pina]." Id.  They advised the CHS "to speak with [Romero] about this because [Pina] does not talk about money laundering." Id.  Romero "has gas stations to assist with the laundering of money." Id. |
| **No. 10** | During an in-person conversation with the CHS, Romero referred to "[handling] bulk cash for [Pina]." Id. at p. 25. |
| **No. 11** | Romero and the CHS discussed "going into business," but that the former "needed to discuss the plan with [Pina]." Id.  The recording device failed "due to technical difficulties." Id.  The CHS informed the FBI that after this malfunction, Romero agreed to launder illicit proceeds. Id. at pp. 25-26 |

The affidavit also sets forth physical evidence. Administrative subpoenas revealed that Pina "had over 100 contacts utilizing [Romero's cellular phone]" between January and December

2019.  Id. at p. 12.  The FBI obtained two consecutive orders authorizing "the use of a pen register and trap and trace devices on" Romero's cellular phone.  Id. at p. 28.  From October 23, 2019 to January 27, 2020, Romero's cellular phone made or received 469 calls and nine text messages to and from Pina.  Id.

Pina attempts to undermine the CHS, asserting that the affidavit "[made] no effort to explain the source of [their] knowledge, whether it is firsthand or whether the information has been corroborated to any degree." (Docket No. 52 at p. 14.)  The CHS is an embedded source, garnering the trust of the target subjects.  (Docket No. 52 at p. 13.)  They immediately informed the FBI that a vessel laden with cocaine sailed toward Puerto Rico. (Docket No. 52, Ex. 2 at p. 19.)  The USCG intercepted this vessel, corroborating the CHS and solidifying his or her credibility.

Pina also contends that the FBI failed to confirm the information provided by unidentified individuals.  (Docket No. 52 at p. 18.)  He proposes that "[a]ll it would have taken to corroborate or verify [these statements] would have been to instruct the confidential source to inquire as to the knowledge or prior dealings of the [unidentified individuals] with [Pina]." Id.  This proposition is absurd.  Pina would have the CHS risk his or her safety by asking DTO members, "what is the extent of your relationship with Pina?" as if they were at a deposition.  The

United States need not expose a CHS to danger or compromise its
investigation to apply for an interception order.  The Court is in
no position to second-guess the safety measures employed by trained
law enforcement agents.  The United States demonstrated a
reasonable probability that the FBI would obtain evidence of a
crime by intercepting communications from Romero's cellular phone.
Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003) (holding that
"the mercurial phrase 'probable cause' means a reasonable
likelihood") (citation omitted).  Accordingly, the "totality of
the circumstances" in Turner's affidavit sufficiently establishes
probable cause.  United States v. Anzalone, 923 F.3d 1, 4 (1st
Cir. 2019).

### B. Necessity

Pina argues that the "Title III order was more like the
first step in the investigation, rather than a last resort."
(Docket No. 52 at p. 21.)  The United States purportedly failed
to satisfy this "strict" requirement, a "high threshold for law
enforcement before intercepting the communications of private
citizens."  Id.  Pina misunderstands the necessity requirement,
imposing a heightened burden of proof on the United States.  This
requirement is "not overly demanding."  United States v. Rivera,
267 F. Supp. 3d 275, 277 (D. Mass. 2017) (citation omitted).

Title III requires a "reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." United States v. López, 300 F.3d 46, 52 (1st Cir. 2002) (citation and quotation omitted). The United States need not "show that other investigatory methods have been completely unsuccessful, nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before resorting to electronic surveillance." United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002) (citation omitted). In sum, this requirement serves to "assure that wiretapping is not resorted to in situations where traditional techniques would suffice to expose the crime." Id.

**1. The Preliminary Investigation**

The United States applied for a Title III order "because normal investigative techniques . . . failed to fully achieve the goals and objectives of [the] investigation" (*i.e.* "[d]iscovering the full scope and identification of key personnel involved in illegal drug trafficking and money laundering"). (Docket No. 52 at p. 30.) The CHS gathered valuable information, but his or her utility is limited. The target subjects withhold certain information, having no reason to divulge more information than necessary. (Docket No. 52, Ex. 2 at p. 32.) A controlled purchase

of cocaine would only expose the seller to criminal liability,
permitting high-ranking associates to remain at large.  Id.

Physical surveillance serves to corroborate previously
planned criminal activity, but does not reveal the purpose or
intent of the target subjects.  Id. at p. 32.  Federal law
enforcement officers observed Rogelio's gas station to confirm
Romero's presence at this location, but exterior security cameras
stymied additional surveillance.  Id.  Romero resides in a gated
community with security officers, rendering physical surveillance
difficult.  Id. at p. 33.  The FBI contemplated a trash search,
but Rogelio's gas station collects debris in an industrial size
dumpster.  Id. at p. 37.  Gathering evidence "would be extremely
difficult without the involvement of the local municipal trash
collection agency, which could alert the target subjects."  Id.

The FBI intended to commission an undercover law
enforcement agent ("UC"), but the bureau "failed to produce a
suitable" candidate.  Id. at p. 34.  According to Turner, DTOs in
Puerto Rico are "very suspicious of non-Puerto Ricans or
individuals not associated with the island . . . and do not speak
Spanish."  Id.  The target subjects may sell cocaine to the UC,
but would refrain from divulging the source of controlled
substances, the money laundering scheme, and other incriminating
evidence.  Id.; see Rivera, 267 F. Supp. 3d at 277 (holding that

the United States fulfilled the necessity requirement in part
because a cooperating witness "was only a drug customer of [the
defendant] and could not obtain information about [their] sources
of supply, the internal operations of [the DTO], or other customers
of the [the defendant]").

Search warrants generally "produce some evidence of
criminal activity," but do not generally "[establish] the scope of
money being laundered [or] associates participating in these
illegal activities." Id. at p. 35; see Rodrígues, 850 F.3d at 10
("We have regularly upheld affidavits in support of wiretap
applications where the agents assert a well-founded belief that
the techniques already employed during the course of the
investigation have failed to establish the identity of
conspirators, sources of drug supply, or the location of drug
proceeds.") (citing cases).

Requesting to interview the target subject is reckless,
particularly because the FBI lacked "sufficient evidence" to
leverage against Romero and Pina. Id. Approaching the target
subjects would also undermine the investigation and "[result] in
the possible destruction or concealment of documents and other
evidence." Id. at p. 36. The United States obtained grand jury
subpoenas to recover financial information. Id. Additional

reliance on this technique may, however, alarm known and unknown co-conspirators.  Id.

        Covert electronic surveillance "show[s] patterns of life," but lack sound.  Id. at p. 37.  Law enforcement agents "could only speculate about the activity that was being observed." Id.  The FBI nonetheless utilized two 30-day GPS tracking orders. Id. at p. 38.  Evidence acquired from these orders corroborated the CHS regarding the location of an unidentified individual.  Id. The CHS informed the FBI, however, that unidentified individuals "would often borrow vehicles not registered to [them] in order to transport any illicit narcotics."  Id.  Pen registers do "not establish the identities of all persons called, or the content of the conversations."  Id. at p. 39.  Moreover, "narcotic traffickers often subscribe to telephones in fictitious names (e.g. Mr. Claro Chip), or use names of family members or other associates . . . in an attempt to obstruct law enforcement."  Id.; see Ashley, 876 F.2d at 1073 (holding that "the craftiness and wariness of the intended targets is a significant factor to be considered by the court in its determination of whether to authorize electronic surveillance").

        **2. A Title III Wiretap is Necessary**

        Pina's motion to suppress is based on hyperbole and conclusory statements.  He maintains that the "government's only

effort toward ascertaining whether [Romero] or [Pina] were in fact engaging in illegal activity consisted of assigning a forensic accountant to the investigation and identifying bank accounts. Nothing more." (Docket No. 52 at p. 22.)[6] The United States did, in fact, retain a forensic accountant to analyze "multiple bank accounts" that the FBI "identified as a result of Grand Jury subpoenas" and "Puerto Rico government database checks." (Docket No. 52, Ex. 2 at p. 41.) The FBI implemented additional investigative techniques, including interviews with the CHS, physical surveillance, consensually recorded conversations, pen registers, GPS trackers, administrative subpoenas, and Grand Jury subpoenas. (Docket No. 52, Ex. 2 at pp. 18-41.) Law enforcement agents need not employ every conceivable measure to investigate criminal acts. See United States v. Lazú-Rivera, Case No. 03-249, 2004 U.S. Dist. LEXIS 27002 at *29 (D.P.R. Dec. 29, 2004) ("Law enforcement authorities will satisfy [the necessity] requirement, if within the affidavit it is explained what investigative techniques have been utilized, which have proven or will result fruitless once attempted and whether the methods or techniques

---

[6] Pina maintains that "agents made no effort at all," alleging that "[perhaps they] did not want to go through the trouble of analyzing financial documents and thought it would be easier to listen to phone calls." (Docket No. 52 at p. 23.) *Ad hominem* attacks are emblematic of weak, unsupported arguments. The Court will disregard this statement and expects better from counsel. Arguments in this forum shall focus on the law and the facts of the case.

then or still in use, alone or combined with others not yet utilized, would likely fail to uncover the full extent of the conspiracy.") (Delgado-Colón, Mag. J.).

Pina presumes that the FBI "made no attempt to seek records for ticket sales and revenues related to [Pina's] live concerts." (Docket No. 52 at 22.) The redacted affidavit provides, however, that "[g]rand jury subpoenas have been and will continue to be utilized." (Docket No. 52, Ex. 2 at p. 36.) Any assessment of the materials within the FBI's possession is pure speculation. Whether the United States obtained specific financial records may be relevant, but not dispositive. A Title III order "will not be overturned simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used." United States v. Goldstein, 989 F.3d 1178, 1196 (11th Cir. 2021) (internal citation and quotation omitted).

The motion to suppress diminishes the need for a Title III warrant, averring that "the agents already had actionable information regarding which businesses were already being utilized to launder funds and potential methods employed by [Romero] and [Pina]." (Docket No. 52 at p. 22.) Limited success at exposing a criminal endeavor does not, however, negate the need for a Title III warrant. United States v. Cao, 471 F.3d 1, 3 (1st Cir. 2006) ("[T]he partial success of the investigation [does] mean that there

[is] nothing more to be done."); see United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000) ("[T]he mere attainment of some degree of success during law enforcement's use of traditional methods does not alone serve to extinguish the need for a wiretap.").

The Court affords the United States discretion "in choosing how best to" investigate criminal acts before applying for a Title III order. United States v. David, 940 F.2d 722, 728 (1st Cir. 1991) ("The inquiry is not rigid or rule-oriented; to the precise contrary, Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness."). Congress did not set forth an exhaustion requirement, demanding the United States provide "proof positive that, without electronic assistance, a promising investigation is up a blind alley." Id. at 729. Consequently, the issuing Court's conclusion that the United States satisfied the necessity requirement is reasonable and more than minimally adequate to sustain the Title III order  See United States v. Yeje-Cabrera, 430 F.3d 1, 8 (1st Cir. 2005) ("[T]he determination of necessity is properly committed to the issuing judge in the first instance, and we will uphold the sufficiency of the affidavit where the issuing court could have reasonably concluded that normal

investigatory procedures reasonably appeared to be unlikely to
succeed.") (citation and quotation omitted).

### C. Minimization

Pina avers that the FBI "failed to minimize Intercepted
Call 121." (Docket No. 52. at p. 25.) Title III surveillance
must occur "in such a way as to minimize the interception of
communications not otherwise subject to interception." 18 U.S.C.
§ 2518(5). The FBI must "stop listening and/or recording when it
[becomes] apparent that a conversation was not related to the
criminal investigation." United States v. Gordon, 871 F.3d 35, 47
(1st Cir. 2017). To ascertain whether the United States minimized
interceptions in accordance with Title III, the Court "make[s] an
objective assessment in light of the facts and circumstances known
to the government at the relevant points in time." London, 66
F.3d at 1236 (citation omitted). Factors including "1) the nature
and complexity of the suspected crimes; 2) the thoroughness of the
government's precautions to bring about minimization; and 3) the
degree of judicial supervision over the surveillance process" are
material. Gordon, 871 F.3d at 48.

Pina and Romero allegedly "had an innocent conversation
for the first 10 minutes and 45 seconds of the call." (Docket No.
52 at p. 26.) The "mundane matters" discussed during Call 121
included "the large amounts of revenues derived by [Pina] after he

successfully organized and promoted over ten concerts for reggaeton superstar Daddy Yankee between December 2019 and January 2020." Id.   The concert proceeds serve as a shield and a sword: The FBI purportedly failed to obtain "records for ticket sales" in furtherance of the investigation, but violated Title III by listening to a conversation about reggaeton concerts.

Pina and Romero discussed "2 million in an account" belonging to "Don Felix" at the onset of the conversation. (Docket No. 114, Ex. 2 at p. 1.)  Accordingly, minimization of Call 121 from its inception is unwarranted.  Large amounts of funds clearly pertain to a money laundering investigation.  The Title III order also concerned DTO allegations.  Id.  The First Circuit Court of Appeals has held that when "an investigation is focused largely on blueprinting the shape of the conspiratorial wheel and identifying the spokes radiating from its hub, the need to allow latitude to eavesdroppers is close to its zenith." Hoffman, 832 F.2d at 1308.

Courts may consider "at exactly what point during the authorized period the interception was made." United States v. Dimora, 836 F. Supp. 534 (N.D. Ohio 2011) (citing Scott v. United States, 436 U.S. 128, 141 (1978) (holding that interceptions obtained during the "early stages of surveillance" may be "unreasonable later on . . . once the nonpertinent categories have been established")).  Call 121 occurred on February 6, 2021, two

days after issuance of the Title III order and on the first day of
the interception period.  Docket No. 52, Ex. 1; Docket No. 98 at
p. 4.   At this juncture, the nature of the money laundering and
drug trafficking conspiracy remained ambiguous.  See, e.g., United
States v. Goffer, 756 F. Supp. 2d 588, 596-97 (S.D.N.Y. 2011)
(denying the defendant's motion to suppress in part because "the
government's most egregious failure occurred in the early stages
of the wiretap, when agents were presumably still learning to
recognize the voices of Drimal's interlocutors as well as identify
their patterns of conversation").

      Interception of Pina and Romero's subsequent discussion
regarding the sale of the former's residence, coffee request, and
baseball commentary does not warrant suppression.  "The law does
not require perfection, but rather 'honest effort' on the part of
the  government  in  conducting  wiretaps."  United  States  v.
Velázquez-Feliciano, 107 F. Supp. 2d 134, 139 (D.P.R. 2000)
(Laffitte, J.) (citing United States v. Uribe, 890 F.2d 554, 557-
58 (1st Cir. 1989) ("The statute does not forbid the interception
of all nonrelevant conversations, but rather instructs the agents
to conduct surveillance in such a manner as to 'minimize' the
interception  of  such  conversations.").   Pina  claims  that
"generally courts afford agents roughly two or three minutes to
determine whether a particular call is subject to minimization."

(Docket No. 52 at p. 27.)   The Title III inquiry is, however, inimical to inflexible regulation.   Minimization is "analyzed on a case-by-case basis looking to the reasonableness of the interceptor's conduct."   United States v. López, Case NO. 99-079, 2000 U.S. Dist. LEXIS 8060 at *21 (D. Me. Apr. 28, 2000) (citing Hoffman, 832 F.2d at 1308).   The circumstances of Call 121 and the underlying investigation do not warrant suppression. Consequently, Pina's motion to suppress is **DENIED**.

### D. The Evidentiary Hearing

Pina asserts that "an evidentiary hearing must be held to determine if the government not only unlawfully intercepted the communications in question, but how much of the evidence in this case is tainted by the original illegality of the interception." (Docket No. 52 at p. 30.)   The United States responds that "there is no need to hold a hearing on the matter."   (Docket No. 98 at p. 28.)   The Court agrees.

Pursuant to Franks v. Delaware, 438 U.S. 154 (1978), criminal defendants may challenge an affidavit submitted in support of a search warrant.   A Franks hearing "is primarily a vehicle for challenging a warrant by impeaching the affiant." United States v. Adams, 305 F.3d 30, 36 n. 1 (1st Cir. 2002).   Pina does not, however, have a "presumptive right to an evidentiary hearing."   United States v. Cintrón, 724 F.3d 32, 36 (1st Cir.

Criminal No. 20-258 (FAB)                                              28

2013).  "[T]he decision of whether to conduct an evidentiary hearing [on a motion to suppress] is left to the sound discretion of the district court."  <u>United States v. Brown</u>, 621 F.3d 48, 57 (1st Cir. 2010).  To prevail, Pina must set forth a "sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." <u>Cintrón</u>, 724 F.3d at 36 (quoting <u>United States v. Francois</u>, 715 F.3d 21, 32 (1st Cir. 2013)).  He has failed to meet this threshold. The record is devoid of any material facts in dispute. Accordingly, the motion for a <u>Franks</u> hearing is **DENIED**.

**IV.  Conclusion**

For the reasons set forth above, Pina's motion to suppress and request for an evidentiary hearing are **DENIED**.  (Docket No. 52)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, August 10, 2021.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE