# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
Plaintiff

v.

RAFAEL PINA-NIEVES,
Defendant.

Criminal Case No. 20-cr-258 (FAB)

Hon. Francisco A. Besosa

## UNITED STATES' SENTENCING MEMORANDUM

UNITED STATES DEPARTMENT OF JUSTICE

United States Attorney's Office
District of Puerto Rico
Torre Chardón, Suite 1201
350 Carlos Chardón Avenue
San Juan, Puerto Rico 00918
Tel. (787) 766-5656
Fax (787) 771-4050

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................3

ARGUMENT ....................................................................................................6

    I.    The facts of Pina's case warrant a sentence above the guideline sentencing range. .......................................................................6

        A.    The aggravating circumstances warrant an upward variance. .........6

            *Criminal History* ....................................................................6
            *Amount of Ammunition* ...........................................................8
            *Number of Guns*.....................................................................11
            *Specific Type of Machinegun* ...................................................12

        B.    The aggravating considerations in this case outweigh any potential mitigating considerations.................................................19

    II.    This Court should exercise its authority under *Kimbrough* to vary from the Sentencing Guidelines based on a policy disagreement.............23

        A.    This Court has the authority to disagree with the Guidelines based on a policy disagreement....................................................23

        B.    The Guidelines for these two offenses are not sufficient to address the considerations in 18 U.S.C. § 3553(a), particularly in this District...............................................................................27

CONCLUSION....................................................................................................33

## INTRODUCTION

*"He has learned his lesson. I venture to say with a high degree of certainty, Judge, you will never see him in these courts again . . . ."*

*". . . I have learned and to really think about all the things that shouldn't have happened if I had done things right. I can assure you that there will not be a next time."* [1]

On December 22, 2021, a unanimous jury found Rafael Pina-Nieves guilty of both counts of the indictment. Count One, a violation of 18 U.S.C. § 922(g)(1) (prohibited person in possession of firearms and ammunition), and Count Two, a violation of 18 U.S.C. § 922(o) (possession of a machinegun). The United States Probation Office complied with its mandate and prepared a presentence report of investigation. That report establishes a sentencing guideline calculation for Pina of 33 to 41 months. For the reasons set forth below, the United States recommends a sentence within a variant sentencing range of 46 to 50 months imprisonment. Under the governing authority, there are two paths in this case for imposing a sentence outside the range provided by the Guidelines. This memorandum explains why this Court should employ both of those paths independently and alternatively.

*First*, the aggravating circumstances in Pina's case warrant an upward variance. Pina, who was a convicted felon at the time he was indicted in this case, had received a below-Guidelines sentence for his first federal conviction, and that clearly failed to deter further criminality. As the presentence report explained, he was well aware that

---

[1] Pina and counsel in his last criminal case. (*See* Transcript of Sentencing at 18, 40, *United States v. Pina-Nieves*, No. 12-cr-215, (D.P.R. Jan. 25, 2016), DE 498).

it was a federal crime to possess any firearm or ammunition. Not only did he possess two firearms and over 500 rounds of ammunition, he possessed a machinegun that he had no right to possess even if he was not a felon. And much of the ammunition was of the same type that he possessed before his first conviction, indicating that Pina failed to get rid of the ammunition when required by law to do so. His specific machinegun was also uniquely dangerous to the public—modified Glocks are particularly hard to control and present more of a risk to bystanders. These case-specific considerations demonstrate that the sentencing factors in 18 U.S.C. § 3553(a) warrant a sentence above the guideline range.

*Second*, this Court should impose a variance on the alternative basis that it disagrees with the Sentencing Guidelines under its authority from *Kimbrough v. United States*, 552 U.S. 85 (2007). *Kimbrough* held that district courts can disagree with the Guidelines (there based on the crack/powder cocaine disparity issue), and that courts can vary based on that disagreement "even in a mine-run case." *Id.* at 110. The Supreme Court has explained that *Kimbrough* is not limited to the crack/powder cocaine issue. *Id.* at 91. A *Kimbrough*-based policy disagreement with the Guidelines is warranted in this case because here a "Guidelines sentence itself fails properly to reflect § 3553(a) considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007). The Guidelines for possession of a machinegun and felon-in-possession are insufficient to deter widespread possession of these firearms, protect the public from these firearm offenders, reflect the seriousness of the offenses, or promote respect for the law. And

the insufficiency of the Guidelines for these offenses is particularly problematic in this District, where firearms—especially automatic ones—have caused much carnage.

Despite having a successful career, the resources be a productive law-abiding citizen, and assuring the court he would follow the law, Pina chose to illegally possess firearms, and a machinegun to boot. His sampling of charitable acts on his part do not excuse his criminal behavior. Pina may argue that he is less likely to recidivate because of his resources; but two federal convictions already prove that wrong. The sentence in this case should not give the impression that well-off defendants can buy their way out of the consequences for their behavior. *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) (holding that minimal sentences for white-collar criminals "raise concerns of sentencing disparities according to socio-economic" status); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "minimiz[ing] discrepancies between white- and blue-collar offenses, and limit[ing] the ability of those with money or earning potential to buy their way out of jail"). The only real difference between Pina and the other defendants that come before this Court is that he has more resources.

The aggravating factors in this case militate in favor of a longer sentence. The unacceptable damage machineguns have caused, and the insufficiency of the Guidelines in addressing that damage, likewise support a longer sentence. In the end, the government respectfully requests that the Court select a sentence within a variant sentencing range of 46 to 50 months of imprisonment.

5

**ARGUMENT**

**I.    The facts of Pina's case warrant a sentence above the guideline sentencing range.**

>    **A.    The aggravating circumstances warrant an upward variance.**

There are several aggravating factors in this case that call for a sentence above the guideline range.

***Criminal History***. First, Pina's previous sentence of time served (3 days), failed to deter future criminality.[2] And his offenses escalated from fraud to the possession a deadly machinegun.

"As part of [the § 3553(a)] inquiry, a sentencing judge may consider whether a defendant's criminal history score substantially underrepresents the gravity of his past conduct" and "whether, in a series of past convictions, the punishment appears to fit the crime." *United States v. Flores-Machicote*, 706 F.3d 16, 21 (1st Cir. 2013); *United States v. Garcia-Mojica*, 955 F.3d 187, 193 (1st Cir. 2020) (explaining that a "sentencing court's articulation of these concerns regarding [defendant's] prior lenient treatment" can warrant additional deterrence and thus additional time). In Pina's case, the fact that he is a second-time offender demonstrates that the first conviction failed to dissuade him from recidivating. This fact weighs in favor of a longer sentence.

The prior case is also important to consider in terms of respect for the law. Before his first case for which his firearms license was revoked, Pina possessed ten

---

[2] The parties agreed to jointly recommend a sentence of 8 months, consisting of 4 months of imprisonment and 4 months of home detention. (*See* Plea Agreement at 3, *United States v. Pina-Nieves*, No. 12-cr-215, (D.P.R. May 13, 2015), DE 414).

firearms. After that conviction, it violated federal law for Pina to possess any firearm or ammunition. 18 U.S.C. § 922(g). And, of course, even with a firearms license, it was always illegal for Pina to possess a machinegun. 18 U.S.C. § 922(o). The evidence at trial showed that the 526 rounds of ammunition found in the Caguas house largely corresponded to the ten firearms he had possessed before the first conviction:



In other words, this evidence demonstrates that Pina never got rid of the ammunition that he possessed, despite being required by law to do so. (The only alternative being that he acquired ammunition illegally after no longer being able to purchase them himself.) The sentence in the prior case did not encourage respect for the law.

In fact, the same defendant and attorneys argued in his last case that because of his children and employment, Pina did not need deterrence and would not commit another offense:

```
15                  At this point, Judge, we submit that you should
16    consider, too, that this is not a crime which is accessible of
17    repeating itself.  This is not a crime where the Court has to
18    be concerned with preventing that this keep reoccurring.  This
19    was a one-shot deal.  My client has paid dearly for it.  He
20    has learned his lesson.
21                  I venture to say with a high degree of certainty,
22    Judge, you will never see him in these courts again, certainly
23    not in this position, because he has suffered tremendously
24    already.
```

(*See* Transcript of Sentencing at 18, *United States v. Pina-Nieves*, No. 12-cr-215, (D.P.R. Jan. 25, 2016), DE 498). Pina himself told the sentencing judge: "I can assure you that there will not be a next time." (*Id.* at 40). But with time, these lofty statements by Pina and his counsel proved to be empty promises. The Guidelines do not take into account prior empty promises of reform by a defendant who is again facing a criminal sentence in this Court. This Court should not be misled again.

***Amount of Ammunition***. As the presentence report informs, Section 2K2.1 of the Guidelines governs for the offenses in this case. (DE 295 at 8). But Section 2K2.1 does not contemplate the amount of ammunition involved in the offense. For example, the First Circuit upheld an upwardly variant sentence in *United States v. García-Mojica*, where the defendant in that case was arrested with a Glock pistol that was modified into a machinegun, two high-capacity magazines, and only 47 rounds of ammunition. 955 F.3d 187, 189 (1st Cir. 2020). The First Circuit determined that "[t]he Guidelines

do not take into consideration the extra ammunition García was carrying when apprehended." *Id.* at 193 n.7. Similarly, in *United States v. González-Flores*, 988 F.3d 100 (1st Cir. 2021), the Court of Appeals upheld a variant sentence where the defendant possessed a modified Glock pistol and 43 rounds of ammunition. *Id.* at 102. The First Circuit held that "the district court was entitled to base an upward variance on the especially destructive nature of the gun (here, one modified with an internal chip) and the amount of ammunition that Gonzalez possessed, where those considerations were not adequately accounted for in the [G]uidelines." *Id.* (emphasis added); *United States v. Morales-Negrón*, 974 F.3d 63, 67 (1st Cir. 2020) ("[T]he district court provided several plausible rationales for the upward variance. These included the substantial amount of ammunition [(57 rounds)] and multiple-high-capacity magazines involved in the offense . . .").

The consideration of ammunition as an aggravating factor can be bolstered by specifically pointing to cases like *García-Mojica* where the First Circuit has approved of that consideration. This is seen in *United States v. Ortiz-Vidot*, No. 20-1719, 2021 WL 5863422 (1st Cir. Dec. 10, 2021) (unpublished), where the district court specifically pointed to *United States v. Díaz-Lugo*, 963 F.3d 145 (1st Cir. 2020), for support for it to consider the defendant's three machineguns and more than 200 rounds of ammunition as aggravating factors: "The number of weapons that were found and the number of high capacity magazines and the number -- and that the weapons were automatic and the high number of ammunition that was found. I think there was a case that came down from the Circuit two days ago, *United States v. Diaz-Lugo*, Court of Appeals No.

9

19-1284, which has a similar situation as here in which a sentence way above the guideline sentence was affirmed." (*See* Transcript of Sentencing at 26, *United States v. Ortiz-Vidot*, No. 19-cr-324 (D.P.R. Sept. 5, 2020), DE 162). Though unmentioned in the First Circuit's opinion, this Court's explicit adherence to precedent surely encouraged affirmance.

In felon-in-possession, machinegun possession, and other firearm cases, there is a long line of precedent that allows the district courts to consider ammunition an aggravating factor. *E.g.*, *United States v. Bruno-Campos*, 978 F.3d 801, 806 (1st Cir. 2020) ("Nothing in . . . the guideline provision . . . accounted for the possession of more than one machine gun, substantial quantities of ammunition, and/or multiple high-capacity magazines. . . . [T]hose well-founded concerns sufficed to remove this case from the heartland of the relevant guidelines.") (citation omitted).[3] The defendants in those cases possessed significantly lower amounts of ammunition than Pina did. *United States v. Vázquez*, 854 F.3d 126, 129 (1st Cir. 2017) (quoting sentencing court's determination that 177 rounds was a "tremendous amount of ammunition"). Consistent with the

---

[3] There are three vacating cases that are frequently mentioned in this context but that do not apply. *United States v. Carrasquillo-Sánchez* is not relevant because this First Circuit determined the additional magazines and ammunition there were not a part of the district court's sentencing analysis. 9 F.4th 56, 62 (1st Cir. 2021). *United States v. García-Pérez*, then, remanded so that the district court could reconsider its sentence in light of *United States v. Rivera-Berríos*, 968 F.3d 130 (1st Cir. 2020), where the First Circuit briefly discussed ammunition. *See* 9 F.4th 48, 55 (1st Cir. 2021). This hearing is after *Rivera-Berríos*, so *García-Pérez*'s holding based on its timing will also not apply. And that citation-less paragraph mentioning ammunition in *Rivera-Berríos* is the exception, not the rule. *See* 968 F.3d at 135. All the other firearm cases cut the other way. These three cases were all first-time offenders. If more was needed, Pina possessed hundreds of rounds more than the defendants in all those cases. (DE 268 at 4). And, in any event, these cases are irrelevant because no amount of ammunition is "consistent with" Pina (a felon) possessing a machinegun, certainly not over 500 rounds.

cases that have come in this district and that have been affirmed by the First Circuit, this Court should conclude that the amount of ammunition Pina possessed weighs in favor of a longer sentence.

***Number of Guns***. Pina's Glock pistol that was modified to fire automatically constituted a machinegun. But he also had a second gun—the Smith & Wesson SD40. Section 2K2.1(b)(1) includes an enhancement for the number of firearms, starting with three firearms. Pina does not qualify for that enhancement with only two firearms. Nothing else in Section 2K2.1 accounts for the addition of the Smith & Wesson in this case. *United States v. Matos-de-Jesús*, 856 F.3d 174, 180 (1st Cir. 2017) ("The sentencing guidelines make no provision for the presence of two guns during the commission of an offense under either 18 U.S.C. § 922(g)(1) or 18 U.S.C. § 922(o). . . . Moreover, the presence of that gun was obviously relevant to the nature of the crime. Consequently, the district court did not err in giving weight to that fact."). His guideline calculation would have been the same with just the modified Glock pistol. This Court should consider the possession of the second firearm to be an aggravating factor.

It is more likely than not that there were additional firearms in this secret, behind-the-mirror room. *United States v. Mulkern*, 854 F.3d 87, 90 n.2 (1st Cir. 2017) (explaining that to prove something by a preponderance of the evidence, a party must show that it "is more likely than not") (cleaned up). Though there were no rifles in Pina's Caguas residence at the time it was searched, over 50 of the 526 rounds of ammunition found were for two different models of rifles. (DE 295 at 6). There was also a bayonet the pertained to a rifle in the secret compartment. (DE 251-1 at 13).

And perhaps most damning, Pina himself included rifles (plural) in the list of items that were inside the compartment: "I have money in there, I have all kinds of things in there . . . pistols, *rifles*, bullets." (DE 295 at 5) (emphasis added). So while the government does not challenge the guideline calculation in the presentence report, including the lack of the enhancement for three firearms, this Court can consider the likelihood that he possessed more weapons in the house under section 3553(a). Given the evidence supporting the possession of rifles, Pina would not be able to show that such a finding constituted clear error. *United States v. Correa-Osorio*, 784 F.3d 11, 25 n.20 (1st Cir. 2015) (explaining that clear error requires showing that the "judge's action was wrong with the force of a 5 week old, unrefrigerated, dead fish") (internal quotation omitted). In the end, the possession of at least two firearms, and the likely possession of more, are aggravating facts that weigh in favor of a longer sentence.

***Specific Type of Machinegun***. "A modern machine[gun] can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012). "Short of bombs, missiles, and biochemical agents, [one] can conceive of few weapons that are more dangerous than machine[guns]." *Id.* This Court should note the dangerousness of these types of guns. But it is also presented with idiosyncrasies from Pina's particular type of machinegun, one known to this District—a Glock pistol that was altered with a "chip" device to fire automatically. Modified Glocks present unique risks that also weigh in favor of a longer sentence.

*Lack of Control and Risk to Bystanders.* Handguns that are modified into machineguns are more difficult to control than other automatic weapons. They spray bullets indiscriminately and, as a result, present more of a risk to bystanders. Viewed through the lens of the sentencing factors in section 3553(a)—including the seriousness of the offense, protection of the public, and the need for deterrence—the lack of control and risk to bystanders support a higher sentence.

Consider Pina's Glock 19 model in comparison to the model that is designed and manufactured to fire automatically, the Glock 18. Given the problem with controllability of automatic handguns, the Glock 18 has specific grooves and other design features to limit the upward movement of the shooters arm. *See* Jeffrey Strickland, *Handbook of Handguns*, 15 (2013) (describing earlier version of Glock 18: "the light weight, small size, and extremely rapid rates of fire of a machine pistol make them difficult to control . . . ."); Kyle Mizokami, *Why the Glock 18 Might Be the Most Deadly Gun on the Planet Earth*, Nat'l Interest, May 25, 2018, https://nationalinterest.org/blog/the-buzz/why-the-glock-18-might-be-the-most-deadly-gun-planet-earth-25982. ("A later version, the Glock 18C, has a two inch cut in the top of the slide to expose the barrel. Cut into the barrel are four chevron-shaped cuts designed to vent gases upward, countering the upward barrel rise when firing fully automatic."). Pina's Glock 19 lacks the design features that help with controllability.[4]

---

[4] In a recent trial, an FBI firearms expert explained how the issue of controllability affects law enforcement's ability to test-fire and study modified Glocks: "To test this [modified Glock's] ability, I went to our indoor range. I can't fire something like this in the water tank because of muzzle rise. That means, if it does go full auto, the firing will kick back, and it will keep getting higher and higher. . . ."

Part of the difficulty presented with automatic handguns is that there is no shoulder support. The United States Army, for example, instructs that when firing an automatic weapon in the standing position, the double hand grips and shoulder support are essential for recoil management:



Figure 6-8. Standing, unsupported, example

*Light Machine Gun M249 Series*, Department of the Army at 6-11 (May 2017) (available at     https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ ARN3242_TC%203-22x249%20FINAL%20WEB.pdf).

---

(*See* Trial Transcript at 87, *United States v. Polaco-Hance*, No. 20-cr-313 (D.P.R. July 20, 2021), DE 101) (testimony of Aimee Qulia, forensic examiner of FBI Laboratory in the Firearms and Toolmarks Unit).

Even with the design features that come on the Glock 18, specialty gun ranges in the United States that allow civilians to fire them ordinarily incorporate shoulder support:



BATTLEFIELD VEGAS, https://www.battlefieldvegas.com/weapon/pistols/ (last visited April 3, 2022); *see also* TNT GUNS AND RANGE, http://www.tntgunrange.com/ (last visited April 3, 2022); LOCK & LOAD MIAMI, https://www.lockandloadmiami.com/firearms-packages/ (last visited April 3, 2022).

A modified Glock 19 pistol, which has neither the special design features nor the shoulder support or features like double gripping, is less controllable and thus more of a risk to bystanders than weapons that do. Ted Oberg & Sarah Rafique, *'People will lose their lives' 13 Investigates explosion in illegal 'Glock switches'*, ABC 13 Eyewitness News, January 30, 2022, https://abc13.com/glock-switches-are-illegal-downtown-houston-

officers-shot-hpd-shooting/11518379/ ("[T]he speed of the weapon makes it harder to aim and control, leaving bystanders even more at risk whenever a criminal uses one."); Charlie Gao, *Shootout: 5 Ways to Make a Glock Even Deadlier*, NAT'L INTEREST, February 23, 2019, https://nationalinterest.org/blog/buzz/shootout-5-ways-make-glock-even-deadlier-45332 ("A full auto [chipped] Glock is very imprecise and hard to control . . . ."). This Court should view the "chipped" Glock 19 as an aggravating factor in Pina's case. In light of the sentencing considerations like public protection and deterrence, the lack of control and risk to bystanders point in favor of a longer sentence.

*Size and Concealability*. The federal prohibition (with few exceptions) of machinegun possession includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." *See* 18 U.S.C. § 922(o); 26 U.S.C. § 5845(b). True, that can include modified AK-47s, M16s, M1919s, or other larger machineguns that are used in military contexts.[5] But in terms of domestic crime, handguns present a problem in of themselves—the size and weight of a handgun, relative to larger weapons, make it easier for an individual to conceal it and carry it with them. *See Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 208 (5th Cir. 2012) ("[T]he legislative record reflects Congress's concern

---

[5] *United States v. Sosa-González*, 900 F.3d 1, 3 (1st Cir. 2018) (possession of modified AK-47); *United States v. Whitlow*, 381 F.3d 679, 680 (7th Cir. 2004) (describing firearms and related contraband that included MP40 submachinegun, four Sten type submachineguns, and a tripod designed to fit an M1919).

with the 'particular type of weapon that is predominantly used by the criminal' . . . i.e., the 'handgun.' The handgun's size made it easy to carry and conceal . . . .") (citations omitted).

A handgun's smaller size and concealability are some of the primary factors that lead to its proliferation. This can be seen in this District, where machinegun possessors will frequently be found with small satchel bags that hold either a modified handgun, magazines, or both—something less feasible with larger machineguns. *E.g.*, *United States v. Laboy-Nadal*, 992 F.3d 41, 43 (1st Cir. 2021) (describing arrest after defendant throws satchel bag with machinegun and magazines); *United States v. Laureano-Pérez*, 892 F.3d 50, 51–52 (1st Cir. 2018) (similar). This Court should note, either by judicial notice or even a cursory review of the precedent, that the majority of machinegun possessors in this District have modified handguns, especially Glocks.[6]

*Ease of Creation*. Of growing concern to law enforcement is the relative ease with which devices called auto sears, switch devices, or "chips" can transform a gun into

---

[6] *See, e.g.*, *United States v. Mulero-Vargas*, 24 F.4th 754, 757 (1st Cir. 2022) (modified Glocks); *United States v. Merced-García*, 24 F.4th 76, 79 (1st Cir. 2022) (modified Glocks); *Ortiz-Vidot*, No. 20-1719, 2021 WL 5863422, at *1 (unpublished) (modified Glock); *González-Flores*, 988 F.3d at 102 (modified Glock); *Bruno-Campos*, 978 F.3d at 804 (modified Glocks); *Morales-Negrón*, 974 F.3d at 65 (modified Glock); *Díaz-Lugo*, 963 F.3d at 150 (modified Glocks); *United States v. Díaz-Rivera*, 957 F.3d 20, 22 (1st Cir. 2020) (modified Glock); *United States v. Viloria-Sepúlveda*, 921 F.3d 5, 7 (1st Cir. 2019) (modified Glock); *García-Mojica*, 955 F.3d at 190 (modified Glock); *United States v. Rivera-Santiago*, 919 F.3d 82, 83–84 (1st Cir. 2019) (modified Glock); *United States v. Contreras-Delgado*, 913 F.3d 232, 236 (1st Cir. 2019) (modified Glock); *United States v. Severino-Pacheco*, 911 F.3d 14, 18 (1st Cir. 2018) (modified Glock); *United States v. Pagán-Walker*, 877 F.3d 415, 416 (1st Cir. 2017) (modified Glock); *United States v. Matos-de-Jesús*, 856 F.3d 174, 176 (1st Cir. 2017) (modified Glock); *United States v. Fuentes-Echevarría*, 856 F.3d 22, 24 (1st Cir. 2017) (modified Glock); *United States v. Santa-Otero*, 843 F.3d 547, 550 (1st Cir. 2016) (modified Glock); *United States v. de Jesús*, 831 F.3d 39, 42 (1st Cir. 2016) (modified Glock); *United States v. Díaz-Arroyo*, 797 F.3d 125, 127 (1st Cir. 2015) (modified Glock); *United States v. Gallardo-Ortiz*, 666 F.3d 808, 810 (1st Cir. 2012) (modified Glock).

an automatic weapon. These devices are roughly the size of a penny, making them difficult to intercept and making the transformation of an ordinary Glock into a fully automatic machinegun easy. Chips found in the United States are usually foreign (typically from China), though they can also be made using 3D printers. John Annese, *Brooklyn man used 3D printers to make plastic 'ghost gun' parts: cops*, NY Daily News, March 9, 2022, https://www.nydailynews.com/new-york/nyc-crime/ny-ghost-guns-3d-printer-bust-20220310-qi4tkna32fa5fje33vhqbbba4m-story.html   ("'Haynes   also printed large-capacity magazines and auto sears, or 'Glock switches,' which can turn semi-automatic pistols in to fully automatic guns . . . .").

Chip devices are growing in popularity. Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, THE TRACE, March 24, 2022, https://www.thetrace.org/2022/03/auto-sear-gun-chip-glock-switch-automatic-conversion/ ("In recent years, these small metal or plastic devices have exploded in popularity on the black market . . . ."). Their proliferation is understandably concerning to law enforcement: "'Auto sears are everywhere on the street right now,' said Jefferey Boshek, a 21-year ATF veteran who now serves as the special agent in charge of the Dallas Field Division. 'They're one of the scariest things we've dealt with since I became an agent.'" *Id.*

The ease with which chip devices alter Glocks is disquieting. Congress has determined that machineguns, with rare exceptions, should not be possessed by civilians. 18 U.S.C. § 922(o). The simple creation of a machinegun with chips

frustrates that goal. Along with the other specific features of Pina's weaponry, this factor should weigh in favor of a longer sentence.

When noting aggravating factors (as opposed to, for example, a *Kimbrough* policy disagreement discussed below), the First Circuit instructs sentencing courts to detail concerns beyond those that are "universal in . . . application" to an offense. *Rivera-Berríos*, 968 F.3d at 136. Explaining the particular issues with modified Glocks suffices to distinguish from general machinegun possession. *United States v. Pedroza-Orengo*, 817 F.3d 829, 835 (1st Cir. 2016) (rejecting argument that district court only relied on problem of Puerto Rico gun violence where the court linked that general concern more specifically to "individuals *like [Pedroza]* with guns *of this nature*"). This Court should note the lack of control and risk to bystanders, the size and concealability of modified Glock machineguns, and the troubling ease of modification with chips. In light of the section 3553(a) considerations, these factors warrant a higher sentence.

**B.    The aggravating considerations in this case outweigh any potential mitigating considerations.**

Even if this Court determines that mitigating circumstances do exist in this case, they are still outweighed by the aggravating circumstances.

The potential mitigating arguments made by Pina should sound familiar—he made many of the same arguments in his last case. He made references to his father's entertainment business and employing "dozens, if not hundreds, of other families here in Puerto Rico." (Transcript of Sentencing at 18, *United States v. Pina-Nieves*, No. 12-cr-215, (D.P.R. Jan. 25, 2016), DE 498). Pina's submissions and the presentence report

in this case are likewise filled with mentions of his businesses, musical artists, and status as a public figure. (*E.g.*, DEs 76 at 3–4, 82 at 4 (requesting permission to travel outside of jurisdiction of U.S. courts based on assurances of tracking device purchased by Pina, his "well-known" and "public figure[]" status, and multi-million-dollar business ties); DE 295 at 10–17). But, if anything, Pina's work in the music industry and celebrity connections should weigh against him. Pointing to career success or financial success is unavailing because it did not prevent him from committing at least three federal offenses, and there is no reason to believe that it would prevent him from committing future offenses.

Pina and the character witnesses in the presentence report also cite examples of his involvement with the community. (DE 295 at 10, 13). The government disagrees that some of these facts are even mitigating at all.  More importantly, Pina's ability to make monetary contributions to philanthropies does not exempt him from complying with federal law. USSG § 5H1.10 (providing that socio-economic status is "not relevant in the determination of a sentence"). Rewarding such contributions could give the impression that those with resources like Pina can throw money at their legal troubles. *Mueffelman*, 470 F.3d at 40; *see also United States v. Milo*, 506 F.3d 71, 74 (1st Cir. 2007) ("And if [defendant] had independent means [to pay full forfeiture amount], avoiding a prison sentence on this account would create an appearance that financially successful criminals can buy their way out of prison."). In a similar respect, while the presentence report suggests as a potential mitigating factor that his *last* offense did not involve firearms (DE 295 at 22), his *current* offense obviously does. Multiple firearms

20

and hundreds of rounds of ammunition paint another picture of this defendant and undermine any argument that dangerousness should not weigh against him.

Another regurgitated argument from Pina's last federal prosecution is pointing to his children. In that case, the impact on them was what his counsel called the "biggest punishment," and part of Pina's promise that he would not commit another federal offense. (Transcript of Sentencing at 18, 40, *United States v. Pina-Nieves*, No. 12-cr-215, (D.P.R. Jan. 25, 2016), DE 498). Similar sentiments were made in the interviews with the probation office. (DE 295 at 11–13, 22). But while familial connections and support can be important during and following incarceration, Pina is not the first defendant before this Court to invoke his children and their family's need for them. In a recent sentencing proceeding, this Court refuted the idea because those family considerations did not discourage the offense.[7] Here too, this Court should reject family considerations as warranting a lower sentence.

Even if this Court is inclined to find that some mitigating factors do exist, they are outweighed by the aggravating factors detailed above. Noting the presence of mitigating factors but determining that they are outweighed by aggravating ones is important because weighing of sentencing factors is strictly within the province of the

---

[7] *See* Transcript of Sentencing at 4, *United States v. Bauza-Saez*, No. 18-cr-697, (D.P.R. Oct. 16, 2019), DE 117:

[Defendant]: I believe this is my second error, and I am very repentant of it. I have a family that needs me. And I believe that I didn't have that in mind. That would be all.

[The Court]: You are right. You should have thought about your family when you committed this offense.

sentencing judge. *United States v. Caballero-Vázquez*, 896 F.3d 115, 120 (1st Cir. 2018). ("Decisions that involve weighing the § 3553(a) factors are within the sound discretion of sentencing courts, and [the First Circuit] will not disturb a well-reasoned decision to give greater weight to particular sentencing factors over others.") (cleaned up). And a sentencing judge's choice of emphasis is "not a basis for a founded claim of sentencing error." *United States v. Rivera-Clemente*, 813 F.3d 43, 53 (1st Cir. 2016) (internal quotation omitted).

In sum, much of the potential mitigating considerations in this case appear to suggest that Pina be treated differently than other felons in possession of a machinegun, they are not adequate basis for a sentence reduction in this case and should be rejected. If this Court determines that there are mitigating considerations, they are still outweighed by the aggravating factors detailed above. Pina made these arguments before. They should not enable him to get another slap on the wrist. *Garcia-Mojica*, 955 F.3d at 193 n.6 (holding district court was within its discretion "to determine that [defendant's] recent convictions evidenced that he had not learned from his 'Herculean break' in state court").

II.   **This Court should exercise its authority under *Kimbrough* to vary from the Sentencing Guidelines based on a policy disagreement.**

Few jurisdictions in the United States can compare to Puerto Rico in terms of gun violence. *Kimbrough* provides sentencing judges with discretion to disagree with the Guidelines on policy grounds based on the goals of sentencing in section 3553(a). This Court should impose a variant sentence based on the well-established problem with gun violence in Puerto Rico.

A.   **This Court has the authority to disagree with the Guidelines based on a policy disagreement.**

In *Kimbrough*, the Supreme Court held that district courts have discretion to impose sentences outside the guideline sentencing range based on policy disagreement with the Guidelines. 552 U.S. at 109–11. The issue was based on the district court's disagreement with the 100-to-1 ratio for crack cocaine versus powder cocaine sentences and decision to vary downward based on that disagreement. *Id.* at 92–94. It was an "unremarkable" drug-trafficking case. *Id.* at 110. But the Supreme Court explained that district courts can permissibly vary from the guideline range based solely on its view that the range fails to properly reflect the factors listed in section 3553(a), and that it can do so "even in a mine-run case." *Id.* at 110. *Kimbrough* policy disagreements do not have to be tied to individual, case-specific considerations of an individual defendant's case. *Spears v. United States*, 555 U.S. 261, 264 (2009) ("That was indeed the point of *Kimbrough*: a recognition of district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not

simply based on an individualized determination that they yield an excessive sentence in a particular case.").

This Court has repeatedly expressed concerns with the dangerous nature of machineguns and with the repercussion of the prevalence of these weapons in Puerto Rico. This Court has reiterated that guideline sentences in machinegun cases fail to account for the staggering death toll in Puerto Rico. (*See, e.g.*, Transcript of Sentencing at 11, *United States v. Flores-González*, No. 19-cr-335, (D.P.R. Oct. 24, 2019), DE 37) ("The impact in Puerto Rico of this particular offense is more serious than that considered by the Sentencing Commission when it drafted the [G]uidelines."). Because of this Court's well-established concerns and the need to provide a plausible explanation for a variance, the government urges the Court to explain its disagreement with the Guidelines under the authority of *Kimbrough*. Circuit courts have already approved of this reasoning at sentencing.

In *United States v. Politano*, the First Circuit concluded that the district court had permissibly varied from the guidelines for prohibited transactions involving firearms based on its determination "that the community-specific characteristics in the District of Massachusetts made [the defendant's] offense more serious and the need for deterrence greater than that reflected by the Guidelines." 522 F.3d 69, 73 (1st Cir. 2008). As evidence, the district court had noted: "I think any reader of the daily newspapers is aware that the illegal trafficking of firearms at the street level is a significant contributing factor in what, without exaggeration I think, can be called an epidemic of handgun violence in communities within this district." *Id.* at 72. The court

further explained that the defendant's offense "of engaging in the business of dealing in firearms without a license is 'a very serious offense in [the District of Massachusetts] at this point in time,' specifically because it 'directly facilitate[s] crimes of violence, . . . [and] indirectly facilitate[s] other crimes, including drug offenses' in the District of Massachusetts." *Id.* (alterations in original).

On appeal, the defendant in *Politano* contended the court had improperly varied from the guidelines based on "generalized reports" of local crime trends, as opposed to his "individual conduct." *Id.* Our Court of Appeals held that his argument was "misconceived" because now that the Guidelines are "no longer mandatory," sentencing courts may find that "the Guidelines sentence should not apply . . . *because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations.*" *Id.* at 73–74 (quoting *Rita*, 551 U.S. at 351). Citing *United States v. Booker*, 543 U.S. 220 (2005), *Rita*, and *Kimbrough*, the First Circuit approved of district courts "tak[ing] into account all of the circumstances under which [the defendant] committed the offense, including the particular community in which the offense arose."[8]

---

[8] This Court should not be dissuaded by any perceived inconsistency in how the First Circuit has treated community considerations *as an aggravating factor*. Though the First Circuit said in *Rivera-Berríos* that community considerations like gun violence, "[u]nmoored from any individual characteristics . . . cannot serve as building blocks for an upward variance," 968 F.3d at 137, that decision did not (and, of course, could not) limit this Court's ability to impose a variance based on a *Kimbrough*-based policy disagreement. And as mentioned above, such policy disagreements do not require district courts to tie the disagreement to case-specific facts. *Spears*, 555 U.S. at 264 ("That was indeed the point of *Kimbrough* . . . ."). In short, *Kimbrough*-based policy disagreements provide more leeway and discretion to district courts than what used to be called community considerations; *Rivera-Berríos* does not govern *Kimbrough* variances.

Similarly, in *United States v. Cavera*, the Second Circuit reviewed an upward variance based on the district court's disagreement with how the Guidelines address the market for guns in New York. 550 F.3d 180, 197 (2d Cir. 2008) (en banc). The district court determined that the Guidelines failed to take into account "the greater need for deterrence in New York" for firearms offenses because its firearms laws had produced a comparatively "more profitable black market in firearms." *Id.* Relying on *Kimbrough*, the Second Circuit determined that the district court's rationale, disagreeing with the Guidelines, sufficiently justified the variant sentence. *Id.* And while *Kimbrough* entailed a downward variance, the Second Circuit reminded that "sentencing discretion is like an elevator in that it must run in both directions." *Id.* at 194.

Circuit court approval of district courts exercising their discretion in this manner is seen outside the context of firearm offenses as well. For example, facing the drastic death toll from the opioid crisis, the Sixth Circuit affirmed upwardly variant sentences in parts of the Midwest that were especially affected: "The district court did not abuse its discretion in considering the effect of the opioid epidemic in Ohio, or the seriousness of Robinson's specific offense conduct, in reaching this conclusion." *United States v. Robinson*, 892 F.3d 209, 215 (6th Cir. 2018); *see also United States v. Ford*, 724 F. App'x 428, 434 (6th Cir. 2018) (affirming upward variance where "the district court specifically articulated its policy differences with the Commission as being predicated on local, not national, conditions that have recently and rapidly changed—

specifically the heroin epidemic in Ohio"). Like the severe problem with opioids in Ohio, the murder rate in Puerto Rico is usually one of the highest in the country.[9]

The precedent from the Supreme Court and the circuit courts allows variant sentences based on policy disagreements under *Kimbrough*. The question, then, is whether that is called for with felon-in-possession and machinegun possession in this District. As the next section explains, we argue that it is.

### B.    The Guidelines for these two offenses are not sufficient to address the considerations in 18 U.S.C. § 3553(a), particularly in this District.

Firearm violence is indisputably a problem in Puerto Rico. The island is regularly at the top of the most violent jurisdictions in the country. Firearm offenders also have some of the highest rates of recidivism. And the Guidelines have clearly not served to prevent widespread possession of automatic weapons or otherwise deter firearm crime and violence. The insufficiency of the Guidelines in addressing the section 3553(a) factors warrants a *Kimbrough*-based policy disagreement.

"'Puerto Rico is a hot spot for weapons.'" *Viloria-Sepúlveda*, 921 F.3d at 10. And firearms are used in approximately 90% of murders in Puerto Rico, a percentage that is double the world's average for the use of weapons in homicides (41.2%).[10] In 2020, firearm offenses constituted 11.7% of federal offenses prosecuted nationwide; they

---

[9] U.S. Dep't of Justice, Federal Bureau of Investigation, CRIME IN THE UNITED STATES: 2018, tbl. 5, available at https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-5 (last visited January 6, 2020). Only the District of Columbia had a higher murder rate than Puerto Rico in 2018. *Id.*

[10] Kemuel Delgado, *Gun Violence in the US and Puerto Rico: This Can No Longer Continue!*, POLITICS TODAY, Feb. 25, 2021, https://politicstoday.org/gun-violence-in-the-us-and-puertorico-this-can-no-longer-continue/.

constituted 18.8% of offenses prosecuted in the District of Puerto Rico.[11] The staggering and well-accepted rates of gun violence are authorized sentencing considerations. *United States v. Hernández-Ramos*, 906 F.3d 213, 214 (1st Cir. 2018) (observing that "Puerto Rico's continuing experience with gun violence [is] a permissible sentencing consideration").

Puerto Rico has faced—and continues to face—a wave of armed violent crime. In 2017, Puerto Rico had 20.3 murders per 100,000; in 2018, it was 20 murders per 100,000; in 2019, it was 19 murders per 100,000. Comparatively, the United States averaged approximately 5.0 murders per 100,000—put another way, in 2018 and 2019, Puerto Rico averaged 400% more murders per 100,000 people than the United States.[12] According to statistics available from the FBI, Puerto Rico's murder rate ranked second in the United States in 2019:

| FBI Homicide Rate in 2019 per 100,000 | |
|---|---|
| **Geographic Area** | **Murder and non-negligent manslaughter** |
| District of Columbia | 23.5 (166 murders) |
| **Puerto Rico** | **19 (606 murders)** |
| Louisiana | 11.7 |
| Mississippi | 11.2 |
| Alaska | 9.4 |
| Missouri | 9.3 |

[11] *See* U.S. Sent'g Comm., Statistical Information Packet, Fiscal Year 2020, District of Puerto Rico (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/pr20.pdf).

[12] FBI, Uniform Crime Report, *2019 Crime in the United States*, available at: https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-1 (last visited April 3, 2022).

| | |
|---|---|
| Maryland | 9 |
| South Carolina | 9 |
| New Mexico | 8.6 |
| Arkansas | 8 |
| Alabama | 7.3 |
| Tennessee | 7.3 |
| Oklahoma | 6.7 |
| Illinois | 6.6 |
| Georgia | 6.2 |
| North Carolina | 6 |
| Indiana | 5.6 |
| Michigan | 5.6 |
| Pennsylvania | 5.2 |
| Florida | 5.2 |
| Arizona | 5 |
| Virginia | 5 |
| Kentucky | 4.9 |
| Delaware | 4.9 |
| Texas | 4.9 |
| Nevada | 4.6 |
| Ohio | 4.6 |
| West Virginia | 4.4 |
| California | 4.3 |
| Colorado | 3.8 |
| Kansas | 3.6 |
| Hawaii | 3.4 |
| North Dakota | 3.1 |
| Wisconsin | 3 |
| New Jersey | 2.9 |
| Connecticut | 2.9 |
| New York | 2.9 |
| Oregon | 2.8 |
| Washington | 2.6 |
| Montana | 2.5 |
| Rhode Island | 2.4 |
| New Hampshire | 2.4 |
| Nebraska | 2.3 |
| Wyoming | 2.2 |
| Massachusetts | 2.2 |
| Utah | 2.2 |
| Minnesota | 2.1 |

| Idaho | 2 |
| Iowa | 1.9 |
| South Dakota | 1.9 |
| Vermont | 1.8 |
| Maine | 1.5 |

U.S. Dep't of Justice, Federal Bureau of Investigation, CRIME IN THE UNITED STATES: 2019, tbl. 5, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-5 (last visited April 3, 2022).

When the rates for homicide by firearm are adjusted by age, Puerto Rico stands out globally:



Institute for Health Metrics and Evaluation, *On gun violence, the United States is an outlier*, available at: http://www.healthdata.org/acting-data/gun-violence-united-states-outlier (last visited April 4, 2022). The results are intuitive because "[f]irearm

injuries tend to be more frequent in places where people have easy access to firearms." *Id.*

The statistics surrounding firearm violence "appropriately inform[] and contextualize the relevant need for deterrence." *Viloria-Sepúlveda*, 921 F.3d at 10. Higher sentences for gun-related offenses have a deterrent effect. *See United States v. Martinez*, 184 F. Supp. 3d 1209, 1238 (D.N.M.), *aff'd*, 660 F. App'x 659 (10th Cir. 2016) ("[R]esearch strongly indicates that increases in sentence length have at least some general deterrent effect—especially for criminals facing shorter sentences."); David S. Abrams, *Estimating the Deterrent Effect of Incarceration Using Sentencing Enhancements*, 4 AM. ECON. J.: APPLIED ECON. 32 (2012) (empirical study finding that increased sentences for gun-related offenses decrease certain gun violence). Section 3553(a) instructs district courts to consider the relative need for deterrence. The insufficiency of the Guidelines in deterring widespread machinegun possession warrants a *Kimbrough* policy disagreement.

Similarly, recidivism rates demonstrate the insufficiency of the Guidelines in addressing section 3553(a). According to a 2019 report by the United States Sentencing Commission, firearm offenders recidivated at a higher rate than non-firearms offenders. Some of the study's findings were:

- "Over two-thirds (68.1%) of firearms offenders were rearrested for a new crime during the eight-year follow-up period compared to less than half of non-firearms offenders (46.3%)."

- "Firearms offenders recidivated more quickly than non-firearms offenders. Of the firearms offenders who recidivated, the median time from release to the first

recidivism event was 17 months. Comparatively, the median time from release to the first recidivism event for non-firearms offenders was 22 months."

- "A greater percentage of firearms offenders were rearrested for serious crimes than non-firearms offenders. Of the firearms offenders who recidivated, assault was the most serious new charge for 29.0 percent, followed by drug trafficking (13.5%) and public order crimes (12.6%). Of the non-firearms offenders who recidivated, assault was the most common new charge for 21.9 percent, followed by public order crimes (19.4%) and drug trafficking (11.1%)."

- "Firearms offenders have higher recidivism rates than non-firearms offenders in every Criminal History Category. The difference in recidivism rates between firearms and non-firearms offenders is most pronounced in Criminal History Category I, the lowest Criminal History Category, where firearms offenders recidivated at a rate approximately 12 percentage points higher than non-firearms offenders (45.0% compared to 33.2%)."

- "Firearms offenders appear to desist from criminal activity later in life than non-firearms offenders—firearms offenders continued to recidivate at a high rate until reaching age 50 at the time of release from prison. Even after age 50, firearms offenders recidivated at nearly double the rate of non-firearms offenders in the same age group."

U.S. Sent'g Comm., *Recidivism Among Federal Firearms Offenders* at 4, 48 (June 2019) (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190627_Recidivism_Firearms.pdf). The rate of recidivism is lowest when the sentence is over 120 months. *Id.* at 21 ("Longer sentences result in older ages at release, which may be one factor contributing to the lower recidivism rate for this group.").

As these troubling figures show, the Sentencing Guidelines for felon-in-possession and machinegun possession, which in this case amount to 33–41 months of imprisonment, do not reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, or serve to

protect the public from further crimes. A guideline sentence would therefore "fail[] properly to reflect § 3553(a) considerations." *Rita*, 551 U.S. at 351.

In *Politano*, Judge O'Toole broadly cited "daily newspapers" to remark that firearms were a factor "in what, without exaggeration . . . , can be called an epidemic of handgun violence in communities within [the District of Massachusetts]." 522 F.3d at 72. One shudders to think what Judge O'Toole would think of the news in this District, where gun violence far exceeds any amount of violence in his jurisdiction in recent years.[13] The prevalence of firearms, particularly automatic ones, and the resulting carnage warrant a *Kimbrough*-based policy disagreement. This Court should impose a variance and note that it is alternatively warranted based on that disagreement.

## CONCLUSION

The Supreme Court explained that the Sentencing Guidelines "merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017). The reasonableness of the government's recommendation is bolstered by the fact that it is well below the statutory maximum for each count. *See Viloria-Sepúlveda*, 921 F.3d at 11 ("That this five-year

---

[13] In 2006, when Judge O'Toole expressed this concern, the rate of homicide and non-negligent manslaughter in the District of Puerto Rico was over six times the rate in the District of Massachusetts (18.8 per 100,000 versus 2.9 per 100,000). U.S. Dep't of Justice, Federal Bureau of Investigation, CRIME IN THE UNITED STATES: 2006, tbl. 5, available at https://www2.fbi.gov/ucr/cius2006/data/table_05.html (last visited April 7, 2022). That same year, the District of Massachusetts was below the national average of 5.8 per 100,000, while the District of Puerto Rico was more than three time greater than the national average. U.S. Dep't of Justice, Federal Bureau of Investigation, CRIME IN THE UNITED STATES: 2019, tbl. 1, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-1 (last visited April 7, 2022).

term of imprisonment is substantively reasonable is also evident from the fact that Congress has authorized a term of imprisonment of up to ten years for this offense."); *Fuentes-Echevarria*, 856 F.3d at 26 n.4 (48-month sentence was "well beneath the statutory maximum of ten years" for unlawful possession of machinegun); *United States v. Davis-Torres*, 661 F. App'x 722, 726 (1st Cir. 2016) ("The 60-month sentence is well below the statutory maximum of 120 months for violation of the felon-in-possession statute.").

For the reasons outlined above, the United States of America respectfully requests from this Honorable Court to impose a sentence within a variant range of 46 to 50 months' imprisonment, based on the alternative bases of (a) the circumstances of the case, and (b) a disagreement with the Guidelines.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this Tuesday, April 12, 2022.

W. Stephen Muldrow
United States Attorney

s/María L. Montañez-Concepción
María L. Montañez-Concepción
Assistant United States Attorney

s/José A. Ruiz-Santiago
José A. Ruiz-Santiago
Assistant United States Attorney

s/ Gregory B. Conner
Gregory B. Conner
Assistant United States Attorney
United States Attorney's Office
District of Puerto Rico
Torre Chardón, Suite 1201

350 Carlos Chardón Avenue
San Juan, Puerto Rico 00918
Tel. (787) 766-5656
Fax (787) 771-4050

Certificate of Service

I hereby certify that on this day, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing

to the CM/ECF participants for this matter.

s/ Gregory B. Conner
Assistant United States Attorney