**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **RAFAEL PINA-NIEVES**, <br><br> Defendant. | **CRIMINAL CASE NO:** 20-258 (FAB) |

### RAFAEL PINA-NIEVES' SENTENCING MEMORANDUM[1]

#### I.    INTRODUCTION

Defendant Rafael Pina-Nieves hereby files this Sentencing Memorandum in support of his request for the Court to exercise its sentencing discretion and impose a sentence sufficient, but not greater than necessary, to achieve the purposes of 18 U.S.C. § 3553(a). Mr. Pina-Nieves respectfully suggests that a non-custodial sentence of probation and/or home incarceration is appropriate under the facts and circumstances of this case.

On August 13, 2020, Mr. Pina-Nieves was charged in a two-count Indictment. Count 1 charged the defendant with unlawful possession of a Glock pistol, Model 19, and a Smith & Wesson, Model SD40, and 526 total rounds of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Because the Glock pistol was modified to fire automatically, Mr. Pina-Nieves was charged in Count Two of the Indictment with unlawful possession of automatic weapon, in violation of 18 U.S.C. §§922(o) and 924(a)(2). Mr. Pina-Nieves pled not guilty to all charges and exercised his constitutional right to a trial by jury. On December 22, 2021, a jury found Mr. Pina-Nieves guilty as to both counts of the Indictment.

---

[1] Nothing in this memorandum should be construed as constituting a statement by the defendant, Rafael Pina-Nieves. This memorandum contains arguments by counsel based on the evidence presented at trial and the contents of the Presentence Investigation Report.

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 2
_____

For the offenses of conviction, the Amended Pre-Sentence Investigation Report ("PSR") yielded a total offense level of 20, pursuant to USSG §2K2.1(a)(4)(B)(II)(ii)(I). Because Mr. Pina-Nieves has a Criminal History Category ("CHC") of 1, the United States Sentencing Guidelines Manual ("USSG") provide for an imprisonment range of 33 to 41 months. Nevertheless, based on the arguments that will be more fully developed below, a non-custodial sentence of probation and/or home incarceration is sufficient but not greater than necessary to achieve the federal statutory sentencing purposes.

## II.   A NON-CUSTODIAL SENTENCE IS A JUST AND "SUFFICIENT BUT NOT GREATER THAN NECESSARY" SENTENCE

18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in [§ 3553(a)(2)]." This so-called "parsimony provision" is not merely one of many factors to weigh at sentencing but places a cap above which the Court is *prohibited* from sentencing-even when a greater sentence is recommended by the sentencing guidelines. *See United States v. Denardi,* 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part). In turn, § 3553(a)(2) provides that a sentence should be sufficient but not greater than necessary to:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 3

---

Put simply, when imposing a sentence, the courts are to ultimately consider the totality of the circumstances. *See United States v. Arroyo-Maldonado*, 791 F.3d 193, 198-200 (1st Cir. 2015) (stating that the district court exercises broad discretion in weighing the different sentencing factors during sentencing, to which the court of appeals remains deferential, as long as the sentence is substantively reasonable in light of the totality of the circumstances).

18 U.S.C. § 3553(a) also directs the Court to consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

**A. The history and characteristics of Rafael Pina-Nieves support the imposition of a non-custodial sentence of probation and/or home incarceration.**

The PSR accurately reports that Mr. Pina-Nieves was born on July 4, 1978, in Rio Piedras, Puerto Rico. His father, Rafael Pina-Gomez, deceased, was an executive in the music industry. His mother, Analda Nieves-Cintron, is retired from the telephone company and resides in Bayamón. Mr. Pina-Nieves has an older brother, Victor Manuel Pina-Nieves, who is 44 years old, and also resides in Bayamon and works as an independent road manager for music artists. In addition, Mr. Pina-Nieves also has a paternal sister, Maria Fernanda Pina, who is 27 years old, resides in Florida, and works in the marketing industry.

3

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 4

---

Mr. Pina-Nieves' parents divorced when he was 12 years old. This experience was difficult for the youngster who was very attached to his father, but he continued to maintain consistent contact with him despite the fact that they did not live together. However, Mr. Pina-Nieves would not be able to enjoy the company of his father for long, as he died unexpectedly at the age of 42 of a stroke. The defendant was very much affected by the loss of his father, a man he loved and admired, and continues to grieve his father to this day.

When Mr. Pina-Nieves was still a teenager, he moved to Isla Verde to live on his own. He remained a person deeply committed to his family, values that he continues to instill in his children to this day. Mr. Pina-Nieves lives with his fiancé, Natalia Alexandra Gutierrez, who is 35 years old. She is a highly successful reggaeton music artist in her own right, better known by her stage name of Natti Nattasha. The couple is devoted to their daughter, Vida Isabelle, who is 12 months old. Mr. Pina-Nieves also has three teenage children who reside with him when he is in Puerto Rico at their home in Ciudad Jardin in Gurabo—Mia, Rafael, and Antonio. They have a very close-knit and loving family unit. His children enjoy a special relationship with their father and have thrived with the affection received from their father, the love that permeates their home, and their relationship with their baby sister, Vida Isabel. In fact, Mr. Pina-Nieves purchased villas for his teenage children's mothers at the Ciudad Jardin complex so that they could remain close to him, but still have a close relationship with their mothers. The family enjoys boating and other water activities and they play basketball and exercise together. The life that Mr. Pina-Nieves lives is uncharacteristic of someone deeply entrenched in the music business. His personal life, activities and outings are centered around his children, his fiancé, and other family members.

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 5
_____

The PSR notes an interview with Ms. Gutierrez, the defendant's fiancée, on February 19, 2022. Her statements to the Probation Officer are consistent with Mr. Pina-Nieves' strong devotion to his children. According to the PSR Ms. Gutierrez stated that "she has never met someone who loves [his] children the way he does". PSR at 10. She observed that Mr. Pina-Nieves is usually with his children and "really takes care of his children and family. He does so much that he does not publish in social media." PSR at 11. Ms. Gutierrez also acknowledged Mr. Pina-Nieves' generosity with others, stating that he is "[a]lways thinking about other people. He helps other people grow. He deserves so many good things. I am very proud of him…" *Id.*

The Probation Officer interviewed Wanda Monge, the mother of one of Mr. Pina-Nieves' children, Antonio (14 years old). Despite the fact that her relationship with the defendant has been over for many years, Ms. Monge spoke highly of Mr. Pina-Nieves, describing him as an "excellent and responsible" father. *Id.* Ms. Monge concedes that Antonio has a closer bond with his father than with her, and she is concerned about how the absence of Mr. Pina-Nieves from his life will affect him. These statements were echoed by Eileen Michell Pagan, the mother of two of Mr. Pina-Nieves' children, Mia (17 years old) and Rafael (16 years old). Ms. Pagan indicated that Mr. Pina-Nieves is adored by his children and that they are very close to him, in particular Rafael who is always with his father. She indicated that both she and Ms. Monge are coordinating psychological counseling for the children in order to help them cope with this situation. (*See* PSR at 12.)

Mr. Pina-Nieves' children are very concerned about their father and the imposition of a sentence of imprisonment in this case. Susana, Mr. Pina-Nieves' aunt and right hand, also shares concerns regarding the impact the separation from their father will have on Mr. Pina-Nieves'

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 6
_____

children. *Id.* Researchers and scholars have found strong evidence that the absence of a father from the life of his children negatively affects the social-emotional development of the children. The adverse effect may be more pronounced if the absence occurs during early childhood than during middle childhood and may be more pronounced for boys than for girls. *See* Sara McLanahan[2], Laura Tach[3], and Daniel Schneider[4], *The Casual Effects of Father Absence*, Annual Review of Sociology Vol. 39: 399-427 (July 2013). Effects on a child's social-emotional development have been shown to persist into adolescence. Strong evidence suggests that a father's absence increases risky behavior, such as smoking and early childbearing, as well as negative mental health effects. *See id*. As such, by sentencing Mr. Pina-Nieves to a non-custodial sentence, this Court would not only serve the purposes of federal sentencing laws but will also reduce (in a very real sense) any negative impact that Mr. Pina-Nieves' absence will have on his children's social-emotional development. A non-custodial sentence of probation and/or home incarceration would limit the adverse impact of this process on Mr. Pina-Nieves' children and avoid their trauma from having to live without their father due to his incarceration during their formative years. Surely, this is disproportionate when considered in light of the offense conduct.

**B. Mr. Pina-Nieves' extensive employment record and entrepreneurial success support a non-custodial sentence.**

Mr. Pina-Nieves attended Miguel De Cervantes High School in Bayamon and graduated in 1996. Since having obtained his high school diploma he has continued to expand his knowledge

---

[2] Member of the Office of Population Research, Princeton University at Princeton, New Jersey.

[3] Member of the Department of Policy Analysis and Management, Cornell University at Ithaca, New York.

[4] Member of the Department of Sociology and Robert Wood Johnson Scholars in Health Policy Research Program, University of California at Berkley, California.

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 7
_____

in the music industry, in areas such as computer software, sound engineering, and managing strategies. Mr. Pina-Nieves is licensed as a promoter and has always excelled in the music industry. He has been CEO and President of Pina Records since May 24, 2000. The business was originally owned by Mr. Pina-Nieves' father, Rafael Pina-Gomez. Upon his death on May 28, 2000, Mr. Pina-Nieves had no choice but to assume ownership and control of the family business at an early age. Although he had worked alongside his father since the age of 16, and Mr. Pina-Nieves boldly persuaded his father to focus his attention on reggaeton artists, in addition to the merengue artists they historically represented, the task of controlling his father's record company seemed daunting at the time. Nevertheless, Mr. Pina-Nieves' strategic decision to focus his attention on reggaeton artists was valuable for the company, as Pina Records capitalized on the growth of this now-global musical genre, thought by many to be one of the preeminent music genres in the world. Today, Mr. Pina-Nieves' company directly employs approximately 50 employees and indirectly employs approximately 100 employees.

Mr. Pina-Nieves has a strict work ethic and challenges himself continually with new goals. His overwhelming business success is evidence of his dedication to his business and the artists he represents. Ms. Gutierrez advised the Probation Officer that she admires the defendant's work ethic and commitment to his plans, and the faith that he puts into his projects. (*See* PSR at 11.)

Mr. Pina-Nieves' family members also describe him as hardworking and committed. His aunt, Susana, reflects on the immense responsibility that Mr. Pina-Nieves had to assume at the age of 20 when his father died, stepping into the role as owner of the music business. His tenacity and commitment resulted in the substantial growth of the business. (*See id.*)

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 8
___

It is worthy of note that in addition to assuming the responsibility of stewarding Pina Records at the tender age of 21 when his father died, Mr. Pina-Nieves also assumed the responsibility for providing for his younger paternal sister, Maria Fernanda, who was approximately 6 years old when their father died. PSR at 13. Maria Fernanda was interviewed by the Probation Officer. She described Mr. Pina-Nieves more like a father figure and someone she could always rely on. Her admiration of Mr. Pina-Nieves stems from his ability to keep her father's legacy alive in the business, and the sacrifices he made to dedicate himself to the business and the way it grew under his stewardship. Due to Mr. Pina-Nieves' emotional and financial support she was able to complete her studies. He continues to support her financially to this day. *Id.*

Mr. Pina-Nieves has received unrelenting support from his family and friends during this process. Raymond Ayala (a/k/a Daddy Yankee) and his wife, Mireddys Gonzalez, expressed support for Mr. Pina-Nieves in their interviews with the Probation Officer. Mr. Ayala described Mr. Pina-Nieves as a great friend and a fighter of life. He admires Mr. Pina-Nieves' dedication as a father, family man, friend, and contributor to the community. He has known Mr. Pina-Nieves for close to 30 years. (*See* PSR at 13.) His wife, Ms. Gonzalez, described Mr. Pina-Nieves as "a humanitarian, sincere, giving, super hardworking and an excellent father." *Id.* She also acknowledged Mr. Pina-Nieves' altruism, noting that he donates gifts to children in the central part of the island during the Christmas holidays. *Id.*

Most research conducted on the disconcerting issue of recidivism supports the notion that offenders who have stable employment after release from prison tend to have lower rates of

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 9

---

recidivism.[5] Mr. Pina-Nieves' strong family ties and his stable career puts him a low risk of recidivism.

### C. Mr. Pina-Nieves' history of altruism warrants consideration and supports the imposition of a non-custodial sentence of probation and/or home incarceration.

Mr. Pina-Nieves has always done his part to assist the community in Puerto Rico and elsewhere. As noted in the PSR, Mr. Pina-Nieves donated ice to the elderly after Hurricane Maria in 2017. After the earthquakes that primarily affected the southern part of Puerto Rico in December 2019 and January 2020, he purchased 200 generators and personally donated them to needy families in the most vulnerable areas. On another occasion, while Mr. Pina-Nieves was driving in the highway, he observed a woman on the shoulder of the road whose car was on fire. Mr. Pina-Nieves posted the incident on his social media platforms with an urgent plea for help. That same day, Mr. Ayala and Jose Luis Morera Luna (a/k/a Wisin) joined Mr. Pina-Nieves in purchasing the woman a new car. Mr. Pina-Nieves also regularly does his part to support small businesses by using his social media platforms to promote these businesses free of charge.

His generosity also extends to those individuals he interacts with in his business. Ms. Gutierrez expressed to the Probation Officer that Mr. Pina-Nieves "has helped many people grow in their careers and when they have been down on their luck… For those who may be into drug use, [Mr. Pina-Nieves] will get them the help they need, and this is not part of his job responsibility."  PSR at 11.  As a performer herself, Ms. Gutierrez reflected on how unusual this

---

[5] Ripoli, Stephen J.; Kim, Johnny S.; Bender, Kimberly (2010). "Is employment associated with reduced recidivism?: The complex relationship between employment and crime". *International Journal of Offender Therapy and Comparative Criminology*. 54 (5): 706–20.

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 10
___

is in the music industry, stating that "in the music business, most people tend to turn their backs on those individuals, opting to no longer work with them." *Id.*

### D. A non-custodial sentence of probation and/or home incarceration reflects the seriousness of the offense, promotes respect for the law, provides just punishment, deters criminal conduct, and protects the public.

18 U.S.C. §3553(a) also requires the Court to impose a sentence that "reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, protects the public from further crimes of the defendant, and provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

As a threshold matter, it bears mentioning that this is not a mine-run case of firearms possession. This is a case of constructive, as opposed to actual, firearms possession. Despite Mr. Pina-Nieves' intention to preserve his appellate rights, if we were to assume for the sake of argument that the United States properly proved its case at trial, the evidence at trial reflected that the weapons in question were found inside a passcode-protected safe inside a home that belonged to Mr. Pina-Nieves but where Mr. Pina-Nieves did not reside. This case is not the typical case of illegal weapons possession that is seen in the District of Puerto Rico, where offenders are generally tried and convicted for actual possession of firearms, these firearms often being used in furtherance of drug trafficking or other violent crimes. Here, there was never an allegation, much less proof, that Mr. Pina-Nieves ever touched, much less handled or fired, any of the firearms at issue. The firearms were found in a home in Puerto Rico when Mr. Pina-Nieves was in the British Virgin Islands protecting his family and children from the COVID-19 pandemic. The weapons were not accessible to Mr. Pina-Nieves and there is an absolute absence of evidence that Mr. Pina-Nieves

ever handled, or intended to handle, the firearms at issue. This factor warrants serious consideration and supports the imposition of a downward variance sentence.

"[W]hatever the judge's thoughts as to the deterrent value of a jail sentence, he must in every case reexamine and measure that view against the relevant facts and other important goals such as the offender's rehabilitation." *United States v. Foss*, 501 F.2d 522, 528 (1st Cir. 1974). "Deterrence, incapacitation, and rehabilitation are prospective and societal - each looks forward and asks: What amount and kind of punishment will help make society safe. In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?" *United States v. Cole,* 662 F. Supp. 2d 632, 637, (N.D. Ohio 2008). Surely, however, the Court can agree that, in light of the totality of the circumstances of the offense, and not just the fact that a jury found Mr. Pina-Nieves guilty as charged in the indictment, a non-custodial sentence is sufficient for a non-violent offender whose conduct strays from the heartland of firearms possession cases.

In other words, a sentence of incarceration would not aid in deterring further criminal conduct. There is no evidence that a greater sentence serves to deter criminal conduct. Although, admittedly, a criminal justice system with an efficient adjudicatory and penal mechanism deters criminal conduct, the correlation between increased punishment and less crime is inexistent. Empirical data supports a contrary conclusion. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006). In one prominent study of specific deterrence, which involved federal white-collar offenders, arguably the most rational and educated offenders, in the pre-

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 12

___

guideline era, no difference was found, even between probation and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The von Hirsch analysis, commissioned by the British Home Office, examined penalties in the United States and in several European countries. It concluded that the "correlations between sentencing severity and crime rates... were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."

In what is perhaps a counterintuitive proposition, criminals are not cognizant of the consequences of their crimes or the sentences to which they may be subjected. *Tonry, supra*, at 28-29. "There is generally no significant association between perceptions of punishment levels and actual levels... implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al., The Missing Link in General Deterrence Theory, 43 Criminology 623 (2005).

Mr. Pina-Nieves is an extraordinary man, devoted to his family and children, with a generous spirit and a kind heart. His gratitude for life has been undiminished by his unfortunate conviction in this case. He is not an angry or bitter man. The law, just as life itself and the varied elements of nature that surround us every day, invites balance. The statutory mandate for Federal Judges is to strike that balance by imposing a fair sentence that is not harsher than necessary to achieve the sentencing objectives of Section 3553. Fairness requires an assessment of the

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 13

_____

defendant not in the vacuum of his criminal convictions, but in the entirety of the man that he is and the totality of the life that he has lived.

We urge the Honorable Court that in striking that balance it considers the many positive aspects of the defendant's personal and professional life and, upon doing so, impose a sentence of probation.

**E. The United States' request for an upward Variance is inappropriate and unsupported by the facts and circumstances of this case.**

The irony of the United States' request for an upward variance sentence should not be lost on the Court. On one hand, the Government urges the Court to "not give the impression that well-off defendants can buy their way out of the consequences for their behavior," implicitly referring to Mr. Pina-Nieves' wealth. Docket No. 307 at 5. On the other, the Government urges the Court to throw the book at Mr. Pina-Nieves where the facts and circumstances of the offense in no way support an upward variance, simply because Mr. Pina-Nieves is a "big fish" with name recognition.[6] In other words, the United States urges the Court to not let Mr. Pina-Nieves' wealth absolve him but pleads the Court to make an example out of Mr. Pina-Nieves precisely because he is a public figure. The Court should not follow the United States' request.

**1. *The facts of this case do not support the imposition of a sentence above the applicable guideline range.***

a. Mr. Pina-Nieves' criminal history score adequately reflects his past conduct.

_____

[6] We would be remiss if we did not note the United States' disingenuous filings suggesting that Mr. Pina-Nieves was a tax evader in the hopes of securing an upward variance in this case. (*See* Docket Nos. 286 and 292.) Since the filing a response by Mr. Pina-Nieves conclusively countering the United States' allegations of tax evasion, the United States has been conspicuously silent. In fact, those allegations were completely absent from their sentencing memorandum. It is clear, therefore, that the United States will go to any lengths to attempt to make an example of Mr. Pina-Nieves, even when it is obvious that this is not the case on which to do so.

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 14
_____

In its sentencing memo, the Government urges the Court to consider Mr. Pina-Nieves' past conviction as an aggravating circumstance in this case. The United States relies on *United States v. Flores-Machicote*, 706 F.3d 16 (1st Cir. 2013) for the proposition that the Court may consider that a criminal history score underrepresents the gravity of a defendant's past conduct. (*See* Docket No. 307 at 6.) However, the defendant in *Flores-Machicote* had a lengthy criminal history coupled with prevalent leniency by the local courts. The First Circuit explained as follows:

> [The Court] noted that the defendant's felony conviction for simple possession of heroin and cocaine had been reduced from a charge of possession with intent to distribute; three other arrests for controlled substance violations had resulted in no punishment at all; and a prior conviction for illegal appropriation of a vehicle had resulted in only a six-month suspended sentence. In light of the conduct in which the defendant had engaged and how he fared before the local courts, we think that the district judge had some basis for referring to the earlier sentences as "slap[s] on the wrist."[2] We also think that the judge reasonably could have concluded that one of the defendant's past arrests for distribution of controlled substances likely "[fell] through the cracks" when the local court found no probable cause to proceed with the underlying charge. Having reached these conclusions, it was within the district judge's discretion to find that the defendant's criminal history score did not adequately represent either the seriousness of his past criminal behavior or the likelihood of his recidivism.

*Flores-Machicote* at 21–22. The United States makes no effort to explain how Mr. Pina-Nieves, convicted of a single count of bank fraud, has a criminal history that is akin to that of *Flores-Machicote* or how his criminal history is underrepresented in the PSR.

"It is settled beyond hope of contradiction 'that 'when a sentencing court relies on a factor already accounted for by the sentencing guidelines to impose a variant sentence, [it] must indicate what makes that factor worthy of extra weight.'" *United States v. Rivera-Berrios*, 968 F.3d 130, 136 (1st Cir. 2020)(Citations omitted). Mr. Pina-Nieves' criminal history is not a factor that is

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 15

___

worthy of extra weight. Mr. Pina-Nieves' criminal history is a factor that is already contemplated in his sentencing guidelines computation, as well as in the elements of the offense for which he was convicted in this case, felon in possession of a firearm. The Government is thus inducing the Court to error when it requests that the Court view Mr. Pina-Nieves' criminal history as an aggravating factor. In his prior case, the Hon. Daniel R. Dominguez exercised his sentencing discretion and imposed a sentence that was approximately three months lower than what the parties had agreed-upon. This is a far cry from constituting a history of lenience towards Mr. Pina-Nieves that results in an underrepresented CHC. The United States' arguments to those effects are baseless and, frankly, disingenuous. Mr. Pina-Nieves' CHC is properly calculated, accurately reflects his prior conduct, and does not warrant an upward variance in this case.

        b. <u>The facts and circumstances of this case do not warrant an upward variance.</u>

"The sentencing guidelines are meant to cover the mine-run of particular crimes." *United States v. Rivera-Berrios*, 968 F.3d 130, 137 (1st Cir. 2020)(citing *Spears v. United States*, 555 U.S. 261, 264, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (per curiam) and USSG ch. 1, pt. A (1)(4)(b)). Although, obviously, the Court may vary from the prescribed guidelines range, "the section 3553(a) factors must be assessed in case-specific terms," *United States v. Ortiz-Rodriguez*, 789 F.3d 15, 19–20 (1st Cir. 2015)(quoting Flores-*Machicote,* 706 F.3d at 23). The Court may not abdicate its duty to impose a sentence based on "individual factors related to the offender and the offense." *United States v. Rivera-Gonzalez*, 776 F.3d 45, 50 (1st Cir. 2015).

    The Government urges the Court to consider the amount the amount of ammunition found in Mr. Pina-Nieves' home on April 1, the fact that there were two weapons found with the ammunition, and the fact that one of the weapons was modified to fire automatically and impose

15

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 16
_____

an upward variance sentence because of the inherent danger posed by the possession of large amounts of ammunition, multiple weapons, and machine guns. When viewed in light of the evidence presented at trial and the offenses charged, however, it strains credulity to argue that Mr. Pina-Nieves' possession of these items posed a danger to the community.

As touched-upon above, this is a case constructive, as opposed to actual, firearms possession. More specifically, this is a case of constructive possession of firearms and ammunition on April 1, 2020. The evidence at trial reflected that the weapons in question were found inside a passcode-protected safe inside a home that belonged to Mr. Pina-Nieves but where Mr. Pina-Nieves did not reside. There was absolutely no evidence produced at trial, or any inference that could be drawn from the evidence actually presented, that Mr. Pina-Nieves intended to actually possess the firearms and ammunition found in the home on April 1, 2020. If Mr. Pina-Nieves actually possessed these items, perhaps a credible argument could be made that the offense posed a danger to the community that warrants a variance sentence. That is not the case here.

First, the government takes exception with the amount of ammunition found at the home in question. However, the government concedes that the vast majority of this ammunition pertained to weapons once lawfully owned by Mr. Pina-Nieves, but not found at the home. Thus, the vast majority of the ammunition found could not even be fired by the weapons occupied at the home and the Government has brought forth no evidence that the ammunition that actually could be fired by the two weapons found at the house is unusually large or fall outside ordinary quantity for a machinegun possession case, or even an ordinary gun possession case. The Government, obviously, does not recognize these facts, as intellectual honesty would require, insofar as it undercuts their request for an upward variance.

16

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 17

---

Second, the United States alleges that the Court should consider the presence of two weapons at the home as an aggravating factor. Nevertheless, the Government has never alleged, much less proven, that Mr. Pina-Nieves ever touched, handled, or fired any of the firearms at issue. Thus, the mere presence of these weapons in a home that Mr. Pina-Nieves arguably had control over is not a factor that warrants particular consideration, insofar as this type of firearms possession does not represent a particular danger to the community that is not already addressed in the guideline computations[7].

Finally, the government advances a tedious argument regarding the particular dangers of modified Glocks. However, the dangerous nature of these weapons is a factor that is already contemplated in the guidelines calculation and were "worked into the mix when the Sentencing Commission set the base offense level. *Rivera-Berrios*, 968 F.3d at 136-37. Most importantly, nothing in the facts of this case suggest that Mr. Pina-Nieves ever had actual possession of these weapons, which is the only type of possession that can truly pose a danger to the community, as no credible argument can be made that a weapon can be utilized by an individual who only possesses it constructively.

In sum, the Government is urging the Court to sentence Mr. Pina-Nieves as if he was a gun-toting thug fresh off a shootout when he was found with an automatic weapon in his possession. However, as the Court is aware, the reality is far different. There is no evidence that Mr. Pina-Nieves had any intention of going to the Caguas Real residence on April 1, 2020, the

---

[7] The United States also alleges that "it is more likely than not that there were additional firearms" in the room where the weapons were found. The Government once again forgets that it charged Mr. Pina-Nieves with possessing firearms on April 1, 2020. On that date, only two weapons were found in the Caguas Real residence. The United States' baseless speculation as to whether additional weapons were ever stored there cannot serve as a basis for increasing Mr. Pina-Nieves' sentence.

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 18

_____

date on which he was charged with possessing the firearms and ammunition in question. Similarly, there is no evidence that Mr. Pina-Nieves had ever actually possessed the weapons found. Thus, this is not a run-of-the-mill weapons possession case. This is a case of tenuous constructive possession that, when evaluated against the totality of the circumstances, does not warrant an upward variance and, instead, warrants a downward variance.

    2. **The Government is inducing the Court to error by urging it to rely on *Kimbrough* and impose an upward variance sentence on Mr. Pina-Nieves.**

In a last-ditch attempt to secure a variance in this case, the United States urges the Court to articulate a policy disagreement with the sentencing guidelines in this case. However, the policy disagreement that the Court would presumably articulate, that these guidelines do not properly reflect the dangerousness of automatic weapons in general and their impact on the community in Puerto Rico, was disregarded by the First Circuit as a proper aggravating factor to consider at sentencing in *United States v. Carrasquillo-Sanchez*[8], *United States v. Garcia-Perez*[9], and, most recently, in *United States v. Flores-Gonzalez*[10] where the Court expressly held that "a sentence that varies from a commission-proposed range based solely on a community characteristic of the crime's locale does not reflect any disagreement with the commission's policy-based reasons for setting the range itself." *Flores-Gonzalez* at 22.

---

[8] 9 F.4th 56 (1st Cir. 2021).

[9] 9 F.4th 48, 50 (1st Cir. 2021).

[10] Case No. 19-2204 (May 16, 2022).

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 19

___

Simply stated, the Government is urging the Court to assume a posture that has been rejected by the First Circuit as supportive of an upward variance. In other words, the United States is inducing the Court to error. The Court should therefore reject the arguments made by the Government and instead sentence Mr. Pina-Nieves in conformity with the arguments raised in this memorandum.

### III.     CONCLUSION

The provisions of 18 U.S.C. § 3553 support the imposition of a just and reasonable sentence that considers the circumstances of this case and personal circumstances of the defendant. Mr. Pina-Nieves has so much to offer Puerto Rico during these trying times. His commitment to his family and children, his social conscience and altruism, are reflections of his moral standards, loyalty, and gratitude. Considering all these factors, we urge the Honorable Court to impose a sentence of probation, which is sufficient, but not greater than necessary, and would permit the defendant to achieve his full potential, continue to serve his community, and continue to raise his children.

**WHEREFORE**, Defendant Mr. Pina-Nieves respectfully requests the Court sentence him to a sentence of probation in accordance with the arguments made in the instant memorandum.

**RESPECTFULLY SUBMITTED**.

**WE HEREBY CERTIFY**: That today we have electronically filed the foregoing document with the Clerk of the Court for the District of Puerto Rico, using the CM/ECF system which will send a copy and notification of filing to all counsel of record.

In San Juan, Puerto Rico on this 19th day of May 2022.

*United States v. Rafael Pina-Nieves*
Case No. 20-00258 (FAB)
Sentencing Memorandum
Page 20

_____

                            By: *s/ Maria A. Dominguez*
                              Maria A. Dominguez
                              USDC-PR No. 210908
                              maria.dominguez@dmralaw.com

**LAW OFFICES OF FRANCISCO REBOLLO-CASALDUC**
P.O. Box 195571
San Juan, Puerto Rico, 00919
Tel. 787-765-0505

*s/Francisco Rebollo-Casalduc*
Francisco Rebollo-Casalduc
USDC-PR No. 205603
rebollolaw@gmail.com

*s/ Javier Micheo Marcial*
Javier Micheo Marcial
USDC-PR No. 305310
javier.micheo@dmralaw.com

*s/ Manuel Franco*
Manuel Franco
USDC-PR No. 302406
manuel.franco@dmralaw.com

**DMRA Law LLC**
Centro Internacional de Mercadeo
100 Carretera 165
Torre 1, Suite 402
Guaynabo, PR 00968
787-331-9970